**STATE of Minnesota, Respondent,**

**v.**

**William Francis MELCHERT–DINKEL, Appellant.**

**No. A11–0987.**

Court of Appeals of Minnesota.

July 17, 2012.

Lori Swanson, Attorney General, St. Paul, MN; and G. Paul Beaumaster, Rice County Attorney, Benjamin Bejar, Assistant County Attorney, Faribault, MN, for respondent.

Terry A. Watkins, Watkins Law Office, LLC, Faribault, MN, for appellant.

Considered and decided by WRIGHT, Presiding Judge; ROSS, Judge; and MUEHLBERG, Judge.*

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

## OPINION

ROSS, Judge.

Mark Drybrough hanged himself in England in 2005, and Nadia Kajouji drowned herself in Canada three years later, both shortly after 46–year–old William Melchert–Dinkel, who knew that Drybrough and Kajouji were contemplating suicide, sent each a series of Internet messages from his home in Faribault, prodding them to kill themselves. Melchert–Dinkel instructed Drybrough and Kajouji how to commit suicide by hanging, tried to persuade them to hang themselves, and convinced them that he was a distraught young woman who would commit suicide simultaneously with them or shortly afterward. The state charged Melchert–Dinkel with two counts of urging suicide under Minnesota Statutes section 609.215, subdivision 1 (2004). The district court convicted him of the offense over his objection that his free-speech right to send the Internet messages to Drybrough and Kajouji was protected by the First Amendment. He makes both facial and as-applied constitutional challenges to the statute on appeal. Because the statute is not unconstitutional on its face or as applied to Melchert–Dinkel's conduct, we affirm his convictions.

## FACTS

Minnesota law enforcement officials eventually became involved in the investigation into suicides by a British man in 2005 and a Canadian woman in 2008. Officials learned that a Minnesota computer user had engaged in email and Internet messaging conversations with the decedents shortly before their deaths. The investigation led police to William Melchert–Dinkel.

In March 2008, Sergeant William Haider of the St. Paul Police Department was contacted by Celia Blay, a Briton who had become concerned that an "online predator" had been encouraging persons to commit suicide by hanging. Blay told Sergeant Haider that the predator used a variety of names, including "Li Dao," "Falcon Girl," and "Cami." Blay had traced the predator through a website where users post messages and converse about life, depression, and suicide. The website's members represent themselves as a subculture that believes suicide is a personal right. Blay linked the predator's email address to a male Minnesota resident. She told Sergeant Haider that the predator falsely presented himself as a woman, particularly as a "kind, sympathetic emergency room nurse" who "befriends his victims [by] pretending to be suicidal." Police linked Melchert–Dinkel to the described email addresses.

The British man who killed himself was Mark Drybrough. He hanged himself in Coventry, England, at age 31 in July 2005. Drybrough's suicide occurred within five days after the last of a series of email exchanges between him and Melchert–Dinkel, who had been falsely representing himself to Drybrough online as "Li Dao," a 25–year–old female nurse in Minnesota.

The exchanges between Melchert–Dinkel and Drybrough began on July 1, 2005, when Melchert–Dinkel responded from his email address li_dao05@yahoo.com to a question posted by Drybrough asking whether "anyone [has] details of hanging methods where there isn't access to anything high up to tie the rope to." Melchert–Dinkel, writing as "Li Dao," told Drybrough that, "depending on how tall you are ... you can easily hang from a door using the knob on [one] side to tie the rope to, sling it over the top of the door, attach the noose or loop to yourself then step off and hang successfully." He also wrote that Drybrough could still hang himself if he is tall, offering, "[Y]ou can still do a partial suspension hanging that way by having the noose ext fairly high up and attaching it to yourself, then lowering yourself into a sitting position or kneeling down so you [can] hang that way." He then assured Drybrough that "[i]t is very effective," boasting of personal experience and representing that he, too, would hang himself, stating, "I have trialed it 5 times now with very good results so I am [us]ing it for certain when I go. Unconsciousness occurred in about 10–25 seconds...." Melchert–Dinkel explained, "[I]f [unconsciousness] doe[s] not occur then you need more neck tension and try again." He urged Drybrough to write with any questions, promising, "I'll get back to you asap." He wished Drybrough "good luck."

The next day Drybrough posted Melchert–Dinkel's self-hanging explanation in a message to another inquirer, thankful for what he described as the "instructions" that he received from Melchert–Dinkel. Drybrough also posted a message asking about easily obtainable drugs suitable for quick and painless death by overdose. Melchert–Dinkel responded to Drybrough in a July 18 email that discouraged overdosing and urged hanging:

[A]s a veteran nurse I have found that, as a rule, overdosing is at best very unpredictable and unsure because of so many factors. If you are very serious about dying, I too agree that suspen[s]ion hanging is by far the best and surest method to do, and it is the method I am using also. If you have an[y] questions please feel free to write me or if you just need to talk also. Good luck. Sincerely ... Li Dao 25 f Minnesota.

Drybrough posted a message about using ratchets to hang himself. Melchert–Dinkel responded by instructing Drybrough, "[Y]ou don't need all that of course

just a sturdy knot. . . ." He explained that "once unconsciousness is achieved then the body relaxes naturally and the pressure on the rop[e]/neck actually greatly increases causing death," and he closed warmly as just "Li," after writing, "got to go to bed for a while before work now[.] talk to you tomorrow hun. * *hugs* *."

Melchert–Dinkel's next email to Drybrough as Li Dao followed soon after the last one, beginning in charming fashion, "Sorry to keep bothering you . . . hun," and then inquiring, "I was going to ask if there is a time line involved with your desire to die. Is it soon . . . ?" He represented some degree of urgency while linking his own purported plan to die with the timing of Drybrough's suicide, saying, "[F]or me I want to very badly and plan to soon but [will] stay here for you as long as possible." Melchert–Dinkel then represented falsely that he had recently comforted another Englishman in suicide, watching him die by a hanging online:

> I have had several other friends I have communicated with that are suicidal. The most interesting was a friend also in England that I had communicated with for several weeks. One night two weeks ago he asked if I could be with him when he died, obviously that was not possible physically due to the distance, but unbeknowned (sic) to me he had a web cam and asked if he could hang himself to death while I watched him on the web cam. [At] first I thought he was mad crazy, and wanted a spectticle (sic) and such but after another hour of talking I realized he lived alone . . . and did not want to die alone. [I]n the end I watched him go and it was very peaceful and I was pretty pleased I could make this guys last moments special for him. . . . I'll be here to write to you as I can and be here for you. . . . * *hugs* * Li.

Drybrough responded by revealing that he had a medical condition leaving him with chronic flu-like symptoms, and disclosed a mental-health issue also, "There's something gone wrong with my mind." He told Melchert–Dinkel, "I haven't set a date for my suicide though . . . each day is as good as the next for going ahead with it." Melchert–Dinkel kept his sympathetic tone under the subject line, "I understand," and represented, "I hope to be a good friend at the end for you as you are for me also."

Drybrough wrote to "Li Dao" the next day, explaining that he had taken steps toward hanging himself but expressing difficulty in following Melchert–Dinkel's specific instructions: "I've got a noose hanging in my room, and I've been slowly dropping myself putting on more weight but I've yet to have anything like falling unconscious from doing that." He revealed, "I've had the noose around my neck about 5 times now, but only 2 times did I feel close to being ready."

Drybrough next wrote to "Li Dao" on July 20, sharing, "I've had a day of feeling depressed." Melchert–Dinkel wrote back on July 22 feigning sympathy, "I am here to care and help you." Drybrough replied the next day, struggling about suicide and seeming apologetic about not yet being ready to die with "Li Dao," who had told Drybrough "she" was ready to hang herself as soon as Drybrough was ready. Drybrough wrote, "I keep holding on to the hope that things might change. Caught between being suicidal and considering it. Same old story! . . . I don't want to waste anyone's time. If you want someone who's suicidal, I'm just not there yet. . . . Sorry. I admire your courage, I wish I had it."

Drybrough hanged himself four days later in his Coventry home.

Three years after Drybrough's death, police became interested in Melchert–Dinkel's involvement and they also considered a connection between Melchert–Dinkel and a March 2008 Canadian suicide. Sergeant Haider contacted the Ottawa Police Service when he learned about the suicide and Melchert–Dinkel's communications with the victim, 19–year-old depressed college student Nadia Kajouji. An Ottawa police investigator told Sergeant Haider that Kajouji's computer retained evidence of Internet discussions occurring shortly before Kajouji's death between her and a Minnesota computer user going by the name "Cami" and having an email address of falcon_girl_507@hotmail.com.

Sergeant Haider confirmed that the "falcon girl" email account was associated with the IP address of Melchert–Dinkel's computer. Melchert–Dinkel found Kajouji on a website where users post messages describing various suicide methods. Kajouji posted a message on March 1, 2008, disclosing that she lived alone, that she suffered from severe depression, and that she had "not attempted suicide in the past because [she was] terrified of failing." She requested advice on what suicide method would have the highest chance of success. Posing as "Cami," on March 6 Melchert–Dinkel engaged Kajouji in two separate hour-long discussions six hours apart and also a shorter, ten-minute discussion on March 9, the last day anyone saw Kajouji alive.

The first March 6 discussion began after Melchert–Dinkel apparently sent Kajouji an email responding to Kajouji's March 1 posting; Kajouji opened the discussion to "Cami" by saying, "Thanks for emailing me." The email from Melchert–Dinkel that Kajouji refers to does not appear in the record. But their next three discussions are in the record.

Kajouji and Melchert–Dinkel first conversed in the afternoon. During that conversation, Melchert–Dinkel represented himself as being Cami, a 31–year-old emergency room nurse who, mirroring Kajouji, suffered from severe depression for many years, had undergone treatment, had not improved despite treatment, had decided to end "her" life by suicide soon, and had considered the effectiveness of various methods of suicide. Kajouji stated that she intended to stage an accident and drown herself in a river. During the lengthy discussion that followed, Melchert–Dinkel as Cami raised the issue of self-hanging at least 11 times while pointing out the deficiencies of self-drowning. In particular, he mentioned his supposed intent to hang himself; expounded on the efficacy, painlessness, and practical benefits of self-hanging; detailed the supplies necessary for self-hanging and named the retail stores where they could be obtained; suggested that the two of them die at the same time; and offered to help Kajouji hang herself in view of a webcam with "Cami" watching to provide comfort and assistance. In the same discussion he interspersed several remarks tending to question the effectiveness and wisdom of Kajouji's plan to drown herself. To be clear, at no time did Melchert–Dinkel ever discourage Kajouji from the idea of suicide; to the contrary, he consistently affirmed her intention to commit suicide. Rather, he discouraged only Kajouji's intended suicide method while he advocated steadfastly for Kajouji to die by hanging in view of a webcam through which "Cami" could observe and help in the preparation and the act.

A portion of Melchert–Dinkel's first lengthy discussion with Kajouji covering the suicide method and offering suicide encouragement is as follows:

Cami: I started looking for methods to let go[.] since ive seen every method

used possible at work as a emergency ward nurse[ ] i know what does and don't work so that is why i chose hanging to use[.] ive tried it in practice to see if it hurt and how fast it worked and it was not a bad experience

. . . .

Nadia: I am planning to attempt this Sunday.

Cami: wow ok[.] you want to use hanging too? Or can u?

Nadia: I'm going to jump

Cami: well [] that is ok but most people puss out before doing that plus they don't wanna leave a terribly messy mess for others to clean up

Nadia: I want it to look like an accident. There's a bridge over the river where there's a break in the ice . . . .

Cami: ok[.] otherwise I was gonna suggest hanging . . . .

. . . .

Nadia: I considered train jumping . . . .

Cami: umm yeah[.] if you wanted to do hanging, we could have done it together on line so it would not have been so scary for you . . . .

. . . .

Nadia: Well if I puss out, I think we should do that

Cami: ok that sounds good[.] im off work monday too[.] I can die then easily or any time for that matter[.] I w[an]t to bad

. . . .

Cami: do you have a web cam?

Nadia: yes

Cami: ok well IF it comes down to hanging I can help you with it with the cam[.] p[r]oper positioning of the rope is very important as I[ha]ve found out but we'll cross that path when/if it comes to that hun

. . . .

Cami: that method [hanging] for me is so fast and certain i cant think of no

o[th]er way for me[.] that is why i am so into that[.] i don't want to feel nothing

. . . .

Cami: i[ ] hope im being a help to you [ ] in some way

Nadia: yes it's a big relief to be able to talk to someone about it

Cami: . . . im not trying to tell you how to do it just my experiences and opinions that all

Nadia: i understand. we want what's best for each other

Cami: yes very much so[.] and I don't want you to fail ever! and end up messed up

Nadia: that would be the worst

Cami: omg yes i see that happen a lot

. . . .

Cami: ive seen tons of failed overdoses and bad wrist cuttings and some j[u]mpers fail and many many gunshots that didn't work

. . . .

Cami: in 7 years ive never seen a failed hanging that is why I chose that

. . . .

Cami: how old ru?

Nadia: 21

Cami: ok 31 here[.] so w[e] know what we are doin

Nadia: yeah it's been quite a while

Cami: me too hun[.] I'm ready

. . . .

Cami: would die today if we could but i will w[ai]t and see how it goes for you

. . . .

Cami: do you have something to use for hanging if you choose to do that with me?

Nadia: no I would have to go buy it

Cami: ok that isn't hard to find or get[.] just getting the knot in position needs a

little help which i[ ] can do if we get there

Cami: u ok?

Cami: this is a lot to think about

Nadia: Yeah it feels good being able to be honest with someone

Cami: yes and im honest with you

. . . .

Cami: i want to be found and in decent shape so i can be viewed by my coworkers and friends[.] that is fair to them

. . . .

Cami: that is why im keeping everything here at my home[.] easy for mom

. . . .

Cami: i will be here starting at about 8 am Monday if u need me

. . . .

Cami: if you are still here [ ] then try to come on[line] early monday so we can do it if you want to

Nadia: okay. What sort of rope, etc will [I] need?

Cami: if you [go] to a home depot or menards or any kind of home improvement store [ ] get yellow nylon rope about 8 feet or about 3.5 meters and about 1/2 inch thi[c]k or about 3 cm that is all you need and look around your apartment for somewhere to hang from[.] I can help you with the cam when you need to

Nadia: ok

Cami: 2 cm is thick enough

. . . .

Cami: give thought to everything we talked about love

Nadia: i definitely will[.] thank you again.

Cami: im just tryin to help you do what is best for you not me[.] your welcome

The second lengthy discussion beginning later on March 6 was much the same as the first. In part, the discussion occurred as follows after Melchert–Dinkel initiated the exchange and included similar efforts to urge Kajouji to kill herself by hanging, offering assurances of painlessness and ease.and suggesting that the supposed mutual suicides occur that very evening:

Cami: . . . just sittin here suicidal as always.

. . . .

Cami: how you feelin now?

Nadia: really low

Cami: yeah me too[.] really suicidal too

. . . .

Cami: I had my rope out after we talked today[.] I wanted to put it on to feel it on me

Nadia: are you scared?

Cami: oh no not at all im confident it will work just fine

. . . .

Cami: ru [scared]? . . . . if u are[,] i hope i can help you in any way i can

Nadia: good[.] that is a good feeling[.] the pain will be temporary, then it will be over

Cami: . . . with my hanging it is painless and unconsciousness is so fast

Nadia: how long does it take?

Cami: when I did it in practice it was 10 seconds

Nadia: wow

Cami: honestly it felt like going to sleep for a operation

. . . .

Cami: I wish [w]e [b]oth could die now while we are quietly in o[u]r homes tonite:)

. . . .

Nadia: since i decided that i will go this weekend, i have felt much better.

Cami: great[.] im at peace too[.] and if i cant die with you i will shortly after that

. . . .

Nadia: . . . I must say, I'm feeling a lot better now that I can talk to you

Cami: it makes me feel better too knowing I won't die alone

Nadia: you won't

. . . .

Cami: Monday will be my day[.] wish it were tonite im really at peace with it

. . . .

Nadia: i wonder how it will feel to actually die

Cami: nice

Also during that second discussion, "Cami" offered to send a photographic image of herself to Kajouji by email, which Melchert–Dinkel apparently immediately did from his "falcon girl" email address. He asked Kajouji to respond by emailing a photo of herself. Melchert–Dinkel's emailed image of the fictitious "Cami" does not appear in the record, but Kajouji received it and was comforted, saying, "I'm glad I have a face to your name now," to which Melchert–Dinkel emphasized, "yes it is easier now."

Three days later on March 9, Melchert–Dinkel initiated his third and final discussion with Kajouji. As "Cami," he asked how Kajouji was doing, to which Kajouji replied, "I'm good. I'm glad that things are going to end tonight." And "Cami" asked Kajouji, "[D]id you get a rope in case you need a back up plan[?]" Kajouji answered, "[N]o I didn't. [T]here is a store close by if i need to."

Late that night at 1:43 a.m., Kajouji sent an email to her roommate saying that she was going to brave the weather and go ice skating. That was her last known communication to anyone; she was reported missing on March 11, 2008, and her body was found on April 20, 2008, in the Rideau River, dead from hypothermia or drowning.

Various Minnesota police agencies investigated the relationship between Kajouji's death and Melchert–Dinkel. They were at first concerned from the discovered communications that Melchert–Dinkel might actually be suicidal. The Faribault police department contacted Melchert–Dinkel in May 2008 to address this concern. Confronted with the fact of communications from his computer to Kajouji, Melchert–Dinkel put the blame on his daughters. He told officers they had used his computer with the screen name "falcon girl." He said that they have medical knowledge because his wife is a surgical nurse. He expressed distress over his daughters' computer communications and assured the officers that he would talk to them.

But police were suspicious that Melchert–Dinkel had actually sent the communications encouraging or assisting suicides in online discussions. So St. Paul and Faribault police officers interviewed him about it on January 7, 2009.

The interview confirmed the suspicions. Melchert–Dinkel admitted that, using the names Li Dao and falcon girl, he had visited and participated in suicide-related Internet chat rooms for about four years. He denied having any malevolent intentions and claimed that he merely answered people's questions and served as an advocate for those who wanted to commit suicide. But he acknowledged that he had assisted someone to commit suicide, asserting that the person would probably have killed himself anyway. He admitted to entering into what he and the investigators called a "suicide pact" with a woman from Ottawa. He was aware that the woman jumped into a frozen river, but he emphasized that this was not the method of suicide he had discussed with her. Melchert–Dinkel also recalled his communications with Drybrough and that someone had posted a news article referring to Drybrough's death online and to someone in the United States having helped him to commit suicide using the Internet. Mel-

chert–Dinkel knew that the article was about him because it referred to "Li Dao."

Melchert–Dinkel made various other admissions during the interview bearing on his purposes. He estimated that he asked 15 to 20 people to commit their suicide using a webcam to capture and transmit the event online. No one ever did; he told the officers that he had lied when he represented to others that he had watched a man hang himself. He said that he had been "an accessory" to the suicides of about five people. He told the officers that he had entered into approximately 10 "suicide pacts." He opined that perhaps five people had actually ended their lives by suicide after joining him in pacts but that he was certain about only the Ottawa and Coventry deaths. He admitted that, contrary to his representations to the other member of each pact, he had no genuine plans to kill himself. He was aware that others had posted messages on suicide message boards four times warning to avoid "Li Dao" because "she" encouraged people to die rather than to seek help and live. Melchert–Dinkel would stop communicating for a period after each warning, but then he would return and continue. He stated that he is obsessed with suicide and death but that he stopped visiting suicide websites. He said that, in retrospect, he thinks it was wrong of him "morally, ethically, legally" to "encourage anybody to . . . do something against themselves."

The state charged Melchert–Dinkel with two counts of advising and encouraging suicide in violation of Minnesota Statutes section 609.215, subdivision 1 (2004), for his communications to Drybrough and Kajouji. Melchert–Dinkel moved the district court to dismiss both counts, arguing that section 609.215, subdivision 1, is facially unconstitutional and that his actions constituted protected speech under the First Amendment. The district court denied the

motion. Melchert–Dinkel waived his right to a jury, and the district court held a stipulated-facts trial. *See* Minn. R.Crim. P. 26.01, subd. 3. It found him guilty, and he appeals.

## ISSUES

I. Is Minnesota Statutes section 609.215, subdivision 1, unconstitutionally vague or overbroad on its face?

II. Is Minnesota Statutes section 609.215, subdivision 1, unconstitutional as applied to Melchert–Dinkel's communications?

## ANALYSIS

Melchert–Dinkel questions the constitutionality of his convictions of violating Minnesota Statutes section 609.215, subdivision 1, which criminalizes intentionally advising, encouraging, or assisting another to commit suicide, asserting two First Amendment theories—one facial and one as-applied. We review questions of a statute's constitutionality de novo. *Assoc. Builders & Contractors v. Ventura*, 610 N.W.2d 293, 298 (Minn.2000). Under the Free Speech Clause of the First Amendment, which applies to the states through the Fourteenth Amendment, the government shall "make no law . . . abridging the freedom of speech." U.S. Const. amend. I. Melchert–Dinkel contends that we ought to approach the question of the statute's validity under a presumption of invalidity given its regulation of speech, and on this presumption he argues that the statute is unconstitutional on its face because it is overbroad. He also argues that his discussions with Drybrough and Kajouji were protected speech under the First Amendment such that even if the statute is facially constitutional, it is unconstitutional as applied to the specific conduct that led to his conviction.

## I

We first consider Melchert–Dinkel's facial challenge to the statute. Although he argued to the district court only that the statute was unconstitutional as applied to him and issues generally may not be raised for the first time on appeal, *see State v. Frazier,* 649 N.W.2d 828, 839 (Minn.2002), we believe that the interests of justice would be furthered by our consideration of the issue, and so we will address the merits of his argument. *See Tischendorf v. Tischendorf,* 321 N.W.2d 405, 410 (Minn. 1982).

A statute ordinarily is presumed constitutional. *State by Humphrey v. Casino Mktg. Grp., Inc.,* 491 N.W.2d 882, 885 (Minn.1992). But this is not so with statutes that restrict First Amendment rights; those statutes are not presumed constitutional. *Id.* Specifically, content-based regulation of speech is presumptively unconstitutional. *R.A.V. v. City of St. Paul,* 505 U.S. 377, 382, 112 S.Ct. 2538, 2542, 120 L.Ed.2d 305 (1992). The state bears the burden of proving that such a statute is constitutional. *Casino Mktg. Grp., Inc.,* 491 N.W.2d at 886. Melchert–Dinkel points out the content-oriented nature of section 609.215, subdivision 1, noting that it concerns only the subject of suicide, and on this feature he contends that the statute is presumptively unconstitutional.

Melchert–Dinkel's contention that the statute is presumptively unconstitutional assumes wrongly that the statute regulates the type of speech that does not by its nature fall outside of First Amendment protection. The First Amendment does not protect all speech absolutely. *Virginia v. Black,* 538 U.S. 343, 358, 123 S.Ct. 1536, 1547, 155 L.Ed.2d 535 (2002). It has "never included a freedom to disregard" certain categories of restrictions that the states traditionally have enforced based particularly on the content of the speech. *United States v. Stevens,* —— U.S.

——, 130 S.Ct. 1577, 1584, 176 L.Ed.2d 435 (2010) (quotation omitted). The categories of speech that have been deemed not to implicate the First Amendment are obscenity, defamation, fraud, incitement, speech integral to criminal conduct, *see id.,* and fighting words, *see Chaplinsky v. State of N.H.,* 315 U.S. 568, 571–72, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942). For the reasons that follow, we hold that the legislative prohibition against speech that intentionally advises, encourages, or assists suicide is not speech protected by the First Amendment because it falls into either of two of these categories, or both.

### Speech Integral to Harmful Conduct

The statute does not implicate the First Amendment because, to the extent it prohibits speech, it prohibits speech that is integral to harmful, proscribable conduct. The Supreme Court has held that constitutional freedom of speech does not protect "speech or writing used as an integral part of conduct in violation of a valid criminal statute." *Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490, 498, 69 S.Ct. 684, 688–89, 93 L.Ed. 834 (1949); *see, e.g., New York v. Ferber,* 458 U.S. 747, 761–62, 102 S.Ct. 3348, 3356–57, 73 L.Ed.2d 1113 (1982) (excluding from First Amendment protection the advertising and sale of child pornography in part because the advertising and sale of child pornography is "an integral part" of its unlawful production); *Giboney,* 336 U.S. at 498, 69 S.Ct. at 688–89 (excluding from First Amendment protection union members' picketing adjacent to employer's place of business because the picketing was an integral part of felonious violation of Missouri's antitrust laws).

It is true that attempting or committing suicide is not itself a crime in Minnesota. But this does not reflect either a public policy approving suicide or tolerating as-

sisted suicide. The state's policy against assisted suicide as memorialized in the presently challenged statute is deeply rooted. At statehood, Minnesota adopted the common law as modified and amended by English statutes enacted before the revolution. *Dutcher v. Culver,* 24 Minn. 584, 591 (1877). Suicide was a crime under English law. *See Washington v. Glucksberg,* 521 U.S. 702, 711–12, 117 S.Ct. 2258, 2263–64, 138 L.Ed.2d 772 (1997). Minnesota adopted its own penal code in 1886, and in it statutorily criminalized both attempting suicide and "advis[ing], encourag[ing], abet[ting], or assist[ing] another person in the taking of [his] life." Minn. Penal Code Tit. 9, ch. 1, §§ 143, 144 (Minn. Gen.Stat.1886); *see also* 1885 Gen. Laws ch. 240, § 1, at 311. The legislature decriminalized suicide in 1911, but it has not done so with assisted suicide, which remains a crime today. *Compare* 1911 Gen. Laws ch. 293, § 1, at 409 *with* Minn.Stat. § 609.215, subd. 1 (2010). Tracing the centuries-old legal tradition of societal disdain for assisted suicide, the United States Supreme Court has concluded that "[i]n almost every State—indeed in almost every western democracy—it is a crime to assist a suicide" and that assisted-suicide bans "are longstanding expressions of the States' commitment to the procreation and preservation of all human life." *Glucksberg,* 521 U.S. at 710, 117 S.Ct. at 2263. Recognizing this state's traditionally settled policy against assisted suicide is significant in the First Amendment context because, criminal or not, "a state may constitutionally enjoin" otherwise protected speech that is "undertaken or conducted for an unlawful objective." *Starr v. Cooks, Waiters, Waitresses & Helpers Union Local No. 458,* 244 Minn. 558, 565, 70 N.W.2d 873, 878 (1955) (interpreting *Giboney v. Empire Storage & Ice Company*). And the state supreme court has recognized that this exception to the First Amendment applies alike to objectives codified as

unlawful and to objectives that further the state's otherwise-expressed public policies. *See id.* at 564–65, 70 N.W.2d 873 (explaining *Giboney's* integral-part free-speech exception, stating that "an objective may be declared contrary to public policy or unlawful by either the state's legislature or its judiciary").

Melchert–Dinkel does not contend that the state would violate the Constitution by punishing a person for physically assisting another to commit suicide or that the state could not, if it chose to, return to its historic approach of criminalizing even attempting suicide. *Cf. Glucksberg,* 521 U.S. at 713, 117 S.Ct. at 2264 (observing "that the movement away from the common law's harsh sanctions did not represent an acceptance of suicide"). Nor does he contend that disapproving of suicide and attempting to prevent it are not the state's clear public-policy objectives or that the state has no interest in protecting suicidal persons beyond its borders. We are convinced that speech that intentionally advises, encourages, or assists another to commit suicide is an integral part of the criminal conduct of physically assisting suicide. Separately, it is clear that such speech is also an integral part of another person's suicide itself and that suicide, despite no longer being illegal in Minnesota, remains harmful conduct that the state opposes as a matter of public policy. Under *Giboney* and its progeny, the state may therefore criminalize the prohibited speech without running afoul of the First Amendment.

We are not persuaded otherwise by Melchert–Dinkel's substantial focus on the statute's prohibition against "encouraging" suicide. The statute's prohibition against intentionally encouraging another to commit suicide is akin to the state's general prohibition against aiding and abetting another in the commission of a crime. *See*

Minn.Stat. § 609.05, subd. 1 (2010) (imposing criminal liability for another's crime if one "intentionally aids, *advises,* hires, *counsels,* or conspires with ... [another] to commit the crime" (emphasis added)). This is significant because, as one federal circuit court of appeals has put it, *"every court that has addressed the issue ... has held that the First Amendment does not necessarily pose a bar to liability for aiding and abetting a crime, even when such aiding and abetting takes the form of the spoken or written word." Rice v. Paladin Enters., Inc.,* 128 F.3d 233, 244–45 (4th Cir.1997) ("[T]hat the provision of instructions that aid and abet another in the commission of a criminal offense is unprotected by the First Amendment, has been uniformly accepted, and the principle has been applied to the aiding and abetting of innumerable crimes."). The fact that section 609.215 criminalizes the encouraging of suicide does not alter our holding that the statute is not facially unconstitutional.

**Overbreadth**

 Melchert–Dinkel contends that the statute is at least unconstitutionally overbroad because some of its reach extends into speech that is protected by the First Amendment. "Overbroad restrictions of expression are unconstitutional." *State v. Holmberg,* 545 N.W.2d 65, 70 (Minn.App.1996), *review denied* (Minn. May 21, 1995) (citing *New York v. Ferber,* 458 U.S. 747, 769, 102 S.Ct. 3348, 3361, 73 L.Ed.2d 1113 (1982)). A statute is overbroad "if it deters the exercise of First Amendment rights by unnecessarily punishing constitutionally protected along with unprotected activity." *Matter of Welfare of S.L.J.,* 263 N.W.2d 412, 417 (Minn.1978). A statute is facially overbroad, and therefore constitutionally invalid, only if it reaches well beyond its proper target to prohibit a *substantial* amount of speech protected by the First Amendment. *United States v. Williams,* 553 U.S. 285, 292, 128 S.Ct. 1830, 1838, 170 L.Ed.2d 650 (2008). The

Supreme Court therefore cautions, "Invalidation for overbreadth is strong medicine ... not to be casually employed." *Id.* (quotations omitted).

Applying this standard, we reject Melchert–Dinkel's contention that section 609.215, subdivision 1, is unconstitutionally overbroad. The statute expressly prohibits only a narrow type of speech—speech that intentionally advises, encourages, or assists another in that person's suicide. Paraphrased, a person cannot speak in a manner that purposefully urges or helps another person to kill herself. There is no apparent unconstitutional overbreadth because the statute covers so little, and the broad arena of pro-suicide speech not proscribed by the statute includes the full spectrum of social or political communication on the topic, such as speech promoting suicide acceptance; advocating the creation or recognition of a right to commit suicide or to assist suicide; protesting against laws or organizations that oppose suicide; and increasing awareness of myriad issues that bear on suicidal ideations, suicide methods, or purported suicide benefits. As the district court appropriately observed, a person may, without offending the statute, express any moral, religious, or political view about suicide or assisted suicide.

Melchert–Dinkel's overbreadth argument does not include a list of alleged protected communication that the statute incidentally prohibits. He does, however, make several assertions relevant here. He contends generally that the statute "prohibits ideas, the advocacy of which is at the core of the First Amendment's right to free expression." He does not identify any of the ideas the expression of which the statute prohibits and that the First Amendment would protect, and none is apparent to us. He asserts that applying the statute "proscribe[s] discussion about

the topic [of suicide] and hanging, and wanting to watch." But we do not see this restriction in the statute, which does not on its face proscribe discussion of suicide or hanging so long as the speaker does not advise or encourage or help another to commit suicide. A suicide advocate or opponent may discuss suicide as thoroughly as he prefers; he simply may not, for example, advise a suicidal person to hang herself or encourage or help her to do so. And as disturbing as the idea might be, the statute also does not prohibit a person from discussing his desire to watch someone else commit suicide.

Finally, Melchert–Dinkel asks us to construe the term "encourage" broadly to include "supportive language that agrees with the other person's decision to commit suicide," which definition he contends would constitute speech that falls within First Amendment protection, making the statute overbroad. We are not convinced. The statute does not define "encourage," and so we rely on its ordinary meaning. *See* Minn.Stat. § 645.08 (2010) (providing statutory canon of constructions). It is one of those nearly self-defining words, with its prefix "en" meaning "make" or "put into" and its root referring to one's heart or mind or innermost feelings. *See The Compact Oxford English Dictionary* 350, 510, 512 (2d ed.1991). It is a transitive verb commonly meaning, to attempt to persuade or "to induce" to do a particular thing, or "to stimulate by assistance." *See id.* at 512. So construed, a person would be criminally liable for saying things designed intentionally to persuade another to kill herself or fortifying her suicidal will. For the reasons we have already discussed, we do not see this type of encouragement to be constitutionally protected speech.

Melchert–Dinkel's overbreadth argument is not wholly without merit. Loosely considered, the word "encourage" might additionally encompass merely supportive and agreeable language of the sort that Melchert–Dinkel suggests. But this does not establish unconstitutional overbreadth because the other forms of encouragement are not protected and the statute additionally prohibits advising and assisting a person to kill herself—neither of which Melchert–Dinkel has persuasively argued to be constitutionally protected. We will not deem an otherwise constitutional statute facially unconstitutional merely because the First Amendment might bar its application in a few peripheral circumstances: "The mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Williams,* 553 U.S. at 303, 128 S.Ct. at 1844 (quotation omitted).

We recognize that the state might offend the First Amendment if its statute punished speech that only theoretically and indirectly encourages suicide but that creates no direct connection between the prohibited speech and the harmful conduct to be avoided. *See Ashcroft v. Free Speech Coalition,* 535 U.S. 234, 254–54, 122 S.Ct. 1389, 1403, 152 L.Ed.2d 403 (2002). So, for example, the government does not overcome a free-speech challenge to a statute that bans virtual child pornography on the theory that pedophiles might use the virtual child pornography to encourage children to participate in sexual activity. *Id.* ("Without a significantly stronger, more direct connection, the Government may not prohibit speech on the ground that it may encourage ... illegal conduct."). But section 609.215 does not raise that concern. Its elements allow punishment only when a direct rather than theoretical or indirect connection links the prohibited encouragement conduct (intentionally encouraging suicide) and the harm to be avoided (*the actual suicide* of the person whom the defendant intentionally

encouraged to kill herself). *See* Minn.Stat. § 609.215, subd. 1. By punishing a person for engaging in speech that intends to influence another to commit suicide only when the other person actually commits suicide, the statute penalizes only speech that is integral to the harmful conduct that the state seeks to prevent.

The statute does not sweep too broadly into unprotected speech beyond the proscribable speech integral to harmful conduct that the state can and does prohibit.

### Vagueness

Melchert–Dinkel's facial challenge also includes a vagueness argument. He asserts that section 609.215, subdivision 1, is unconstitutionally vague. He does little to develop this argument. He seems to merge the separate constitutional theories of overbreadth (a First Amendment doctrine) and vagueness (a Fifth Amendment doctrine). This is a mistaken approach. *See Holder v. Humanitarian Law Project*, —— U.S. ——, 130 S.Ct. 2705, 2719, 177 L.Ed.2d 355 (2010) ("[O]ur precedents make clear that a Fifth Amendment vagueness challenge does not turn on whether a law applies to a substantial amount of protected expression [as in an overbreadth challenge].").

 The vagueness argument fails on the merits. We would deem the suicide-aiding statute unconstitutionally vague if it is "so standardless that it authorizes or encourages seriously discriminatory enforcement." *Id.* at 2718 (quoting *Williams*, 553 U.S. at 304, 128 S.Ct. at 1845). On the other hand, we will reject the argument even if the statute is imperfectly written so long as it "provide[s] a person of ordinary intelligence fair notice of what is prohibited," because "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Id.* at 2718–9 (quotation omitted).

A person of ordinary intelligence reading section 609.215, subdivision 1, would understand what it means to intentionally advise, encourage, or assist another to commit suicide. These are not complex, ambiguous, or confusing terms. Courts have had little difficulty understanding similar words defining criminal conduct. *See, e.g., State v. Merrill*, 428 N.W.2d 361, 367 (Minn.1988) (interpreting Minn.Stat. § 609.05, which criminalizes intentionally aiding, advising, hiring, counseling, or conspiring with another to commit a crime). The statute is not unconstitutionally vague.

 We add that Melchert–Dinkel lacks a factual basis on which to raise a facial challenge to the statute on vagueness grounds. He clearly *advised* and *assisted* Drybrough to kill himself by providing instructions on in-home suicide by hanging—instructions that Drybrough acknowledged as being helpful and that he forwarded to others inquiring about hanging before he hanged himself within days of Melchert–Dinkel's communication. He also *encouraged* Kajouji to kill herself by fortifying her suicide decision through deceit, telling her that their mutual suicide decisions were the result of their mature, good judgment ("we know what we are doing") and pressuring her to commit suicide as soon as possible (claiming to be deeply depressed "now" and wanting to ease his own suffering by suicide immediately but promising to wait until after Kajouji killed herself). This conduct is clearly proscribed by section 609.215, and "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others. That rule makes no exception for conduct in the form of speech." *Holder*, 130 S.Ct. at 2719 (quotation omitted). Melchert–Dinkel's vagueness argument fails on these separate, independently dispositive grounds.

## II

We turn to Melchert–Dinkel's as-applied argument that the substance of his communication in particular renders it protected by the First Amendment. The contention highlights his weakest position. To address whether the Constitution protects Melchert–Dinkel's specific communication, we first consider its nature. Put in its true light, Melchert–Dinkel hunted emotionally vulnerable persons—pitiable victims of obvious mental illness who stood precariously on the edge of death. Then, veiled behind a fictitious identity and deceitful words of supposed care and concern and empathy and warmth, he pushed.

He contends that the First Amendment, which does not lift a finger to protect a charlatan who falsely advertises, or a slanderer who defames, or a perjurer who lies under oath, should be applied to protect him for misrepresenting himself as a nurturing but suffering young nurse and intentionally prodding two suicidal, mentally ill strangers to hang themselves on camera in a phony suicide pact simply so that he could watch or take some sort of pleasure in their deaths. *See Beauharnais v. Ill.*, 343 U.S. 250, 266, 72 S.Ct. 725, 735, 96 L.Ed. 919 (1952) ("Libelous utterances [are] not ... within the area of constitutionally protected speech."); *Ill. ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 612, 123 S.Ct. 1829, 1836, 155 L.Ed.2d 793 (2003) ("[T]he First Amendment does not shield fraud."). If the First Amendment does not protect a genuine conspiracy to steal someone else's property, how can it protect a fraudulent conspiracy to end someone else's life? We are confident that the Constitution does not immunize Melchert–Dinkel's morbid, predatory behavior simply because it appears in the form of written words.

Melchert–Dinkel also maintains that his conduct does not constitute "incitement" to imminent lawless conduct because constitutionally unprotected inciting words are only those words that call for an "immediate" harmful response by the listener, he argues, and his words did not. The Supreme Court has held that words that are "directed to inciting or producing imminent lawless action and [are] likely to incite or produce such action" are not constitutionally protected. *Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969). Melchert–Dinkel declares, " 'Imminent' means 'now' or 'immediate.' " His argument has three errors.

First, the contention that "imminent" incitement means "immediate" incitement is irrelevant; although the district court determined that Melchert–Dinkel's speech constitutes incitement, we have held that it also constitutes speech integral to harmful conduct, and he does not address this more obvious categorical basis for rejecting his constitutional challenge.

Second, his words did, in fact, press for the immediate death of his victims. While lulling Drybrough into what he described to police as a suicide pact, he told him, "for me I want to [kill myself] very badly and plan to soon but will stay here for you as long as possible." While gaining Kajouji's confidence and drawing her similarly into a pact supposedly so they could die together or close in time, he told her that he was depressed and suicidal, pressuring, "[I] would die today if we could but I will wait and see how it goes for you," and also, "I wish [w]e [b]oth could die now while we are quietly in o[u]r homes ton[ight] ... nice thought." Melchert–Dinkel's preferred words-to-action relationship was immediate enough even to meet his proffered definition of "imminent."

And third, we are not convinced that imminent means "immediate." In its literal frame, "imminent" describes an event that could occur at any moment, not an

event that will necessarily occur immediately; it is a thing that is looming, at hand, approaching, expectant. *See The Compact Oxford English Dictionary* 818 (2d ed.1991) (defining "imminent" to mean "[o]f an event, etc. (almost always of evil or danger): Impending threateningly, hanging over one's head; ready to befall or overtake one; close at hand in its incidence; coming on shortly"); *see also Black's Law Dictionary,* 884 (4th ed.1968) (defining imminent as "near at hand; mediate rather than immediate; close rather than touching; impending; on the point of happening; threatening; menacing; perilous").

Anecdotal evidence in the First Amendment caselaw preceding *Brandenburg* suggests that the *Brandenburg* Court meant "imminent" as distinct from "immediate." For example, the Court in *Gitlow v. New York* reasoned, "It cannot reasonably be required to defer the adoption of measures for its own peace and safety until the revolutionary utterances lead to actual disturbances of the public peace or *imminent* and *immediate* danger of its own destruction; but it may, in the exercise of its judgment, suppress the threatened danger in its incipiency." 268 U.S. 652, 669, 45 S.Ct. 625, 631, 69 L.Ed. 1138 (1925) (emphasis added). And in *Giboney,* the Court explained, "There was clear danger, *imminent* and *immediate,* that unless restrained, appellants would succeed in making that policy a dead letter insofar as purchases by nonunion men were concerned." 336 U.S. at 503, 69 S.Ct. at 691 (emphasis added). The *Giboney* and *Gitlow* Courts used both descriptions, *imminent* and *immediate,* and the *Brandenburg* Court later opted only for *imminent* in the same legal context; this suggests an intentional preference by the *Brandenburg* Court that we assume to have been substantively motivated.

It is true that the Supreme Court applying the *Brandenburg* incitement test has suggested some urgent temporal relationship between the time of the communication and the speaker's intended time for the incited action. *See Hess v. Indiana,* 414 U.S. 105, 108, 94 S.Ct. 326, 328, 38 L.Ed.2d 303 (1973) (per curiam) ("[A]t . . . worst, [the statement] amounted to nothing more than advocacy of illegal action at some indefinite future time. This is not sufficient to permit the State to punish Hess'[s] speech."). But we have found no application of the incitement test requiring that the speaker intend an instantaneous reaction. *See, e.g., United States v. Moss,* 604 F.2d 569, 573 (8th Cir.1979) (holding First Amendment does not protect a lawyer's speech advising listeners how to disobey tax laws and a personal visit a month later promising to defend them in court for the violation).

■ Melchert–Dinkel adds that his speech is protected because the state did not prove that it actually *caused* the deaths of Drybrough or Kajouji, since they had already been planning their suicides when he encountered them. Again, he is mistaken on the law. The constitutional question before us is not one of substantive due process, but one of free speech. The legislature might decide to criminalize certain speech only when it causes some specific action, as the cases cited by Melchert–Dinkel exemplify. But the First Amendment does not impose that substantive restriction. We note also, as a matter of fact, that the evidence might well support the causal link here, if it were required. Drybrough hanged himself shortly after Melchert–Dinkel wrote specifically instructing him how to accomplish that act; and Kajouji drowned herself shortly after Melchert–Dinkel encouraged her to kill herself, prodding her with assurances of painlessness and peace and comfort in suicide, along with the empty promise that he would soon follow her in death. True,

proving with certainty a causal relationship between the sinister advice and encouragement and the advised and encouraged actions might be difficult since both victims had previously indicated their willingness to die and, of course, they are no longer available to testify. But we are aware of no First Amendment precedent requiring that sort of proof.

## DECISION

The speech prohibited by Minnesota Statutes section 609.215, subdivision 1, is not protected under the First Amendment, and the statute is not vague or unconstitutionally overbroad. Additionally, the state did not violate Melchert–Dinkel's constitutional rights by applying section 609.215 to his conduct. We affirm his convictions.

**Affirmed.**