*713 Justice Kennedy
announced the judgment of the Court and delivered an opinion, in which The Chief Justice, Justice Ginsburg, and Justice Sotomayor join.
Lying was his habit. Xavier Alvarez, the respondent here, lied when he said that he played hockey for the Detroit Red Wings and that he once married a starlet from Mexico. But when he lied in announcing he held the Congressional Medal of Honor (or Medal), respondent ventured onto new ground; for that lie violates a federal criminal statute, the Stolen Valor Act of 2005. 18 U. S. C. § 704.
In 2007, respondent attended his first public meeting as a board member of the Three Valley Water District Board. *714 The board is a governmental entity with headquarters in Claremont, California. He introduced himself as follows: “‘I’m a retired marine of 25 years. I retired in the year 2001. Back in 1987, I was awarded the Congressional Medal of Honor. I got wounded many times by the same guy. ’ ” 617 F. 3d 1198, 1200 (CA9 2010). None of this was true. For all the record shows, respondent’s statements were but a pathetic attempt to gain respect that eluded him. The statements do not seem to have been made to secure employment or financial benefits or admission to privileges reserved for those who had earned the Medal.
Respondent was indicted under the Stolen Valor Act for lying about the Congressional Medal of Honor at the meeting. The United States District Court for the Central District of California rejected his claim that the statute is invalid under the First Amendment. Respondent pleaded guilty to one count, reserving the right to appeal on his First Amendment claim. The United States Court of Appeals for the Ninth Circuit, in a decision by a divided panel, found the Act invalid under the First Amendment and reversed the conviction. Id., at 1218. With further opinions on the issue, and over a dissent by seven judges, rehearing en banc was denied. 638 F. 3d 666 (2011). This Court granted certiorari. 565 U. S. 962 (2011).
After certiorari was granted, and in an unrelated case, the United States Court of Appeals for the Tenth Circuit, also in a decision by a divided panel, found the Act constitutional. United States v. Strandlof, 667 F. 3d 1146 (2012). So there is now a conflict in the Courts of Appeals on the question of the Act’s validity.
This is the second case in two Terms requiring the Court to consider speech that can disparage, or attempt to steal, honor that belongs to those who fought for this Nation in battle. See Snyder v. Phelps, 562 U. S. 443 (2011) (hateful protests directed at the funeral of a serviceman who died in *715 Iraq). Here the statement that the speaker held the Medal was an intended, undoubted lie.
It is right and proper that Congress, over a century ago, established an award so the Nation can hold in its highest respect and esteem those who, in the course of carrying out the “supreme and noble duty of contributing to the defense of the rights and honor of the nation,” Selective Draft Law Cases, 245 U. S. 366, 390 (1918), have acted with extraordinary honor. And it should be uncontested that this is a legitimate Government objective, indeed a most valued national aspiration and purpose. This does not end the inquiry, however. Fundamental constitutional principles require that laws enacted to honor the brave must be consistent with the precepts of the Constitution for which they fought.
The Government contends the criminal prohibition is a proper means to further its purpose in creating and awarding the Medal. When content-based speech regulation is in question, however, exacting scrutiny is required. Statutes suppressing or restricting speech must be judged by the sometimes inconvenient principles of the First Amendment. By this measure, the statutory provisions under which respondent was convicted must be held invalid, and his conviction must be set aside.
I
Respondent’s claim to hold the Congressional Medal of Honor was false. There is no room to argue about interpretation or shades of meaning. On this premise, respondent violated § 704(b); and, because the lie concerned the Congressional Medal of Honor, he was subject to an enhanced penalty under subsection (c). Those statutory provisions are as follows:
“(b) False Claims About Receipt of Military Decorations or Medals.—Whoever falsely represents himself or herself, verbally or in writing, to have been *716 awarded any decoration or medal authorized by Congress for the Armed Forces of the United States . . . shall be fined under this title, imprisoned not more than six months, or both.
“(c) Enhanced Penalty for Offenses Involving Congressional Medal of Honor.—
“(1) In General.—If a decoration or medal involved in an offense under subsection (a) or (b) is a Congressional Medal of Honor, in lieu of the punishment provided in that subsection, the offender shall be fined under this title, imprisoned not more than 1 year, or both.”
Respondent challenges the statute as a content-based suppression of pure speech, speech not falling within any of the few categories of expression where content-based regulation is permissible. The Government defends the statute as necessary to preserve the integrity and purpose of the Medal, an integrity and purpose it contends are compromised and frustrated by the false statements the statute prohibits. It argues that false statements “have no First Amendment value in themselves,” and thus “are protected only to the extent needed to avoid chilling fully protected speech.” Brief for United States 18, 20. Although the statute covers respondent’s speech, the Government argues that it leaves breathing room for protected speech, for example, speech which might criticize the idea of the Medal or the importance of the military. The Government’s arguments cannot suffice to save the statute.
[[Image here]]
“[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.” Ashcroft v. American Civil Liberties Union, 535 U. S. 564, 573 (2002) (internal quotation marks omitted). As a result, the Constitution “demands that content-based restrictions on *717 speech be presumed invalid . . . and that the Government bear the burden of showing their constitutionality.” Ashcroft v. American Civil Liberties Union, 542 U. S. 656, 660 (2004).
In light of the substantial and expansive threats to free expression posed by content-based restrictions, this Court has rejected as “startling and dangerous” a “free-floating test for First Amendment coverage . . . [based on] an ad hoc balancing of relative social costs and benefits.” United States v. Stevens, 559 U. S. 460, 470 (2010). Instead, content-based restrictions on speech have been permitted, as a general matter, only when confined to the few “‘historic and traditional categories [of expression] long familiar to the bar.’” Id., at 468 (quoting Simon & Schuster, Inc. v. Members of N. Y. State Crime Victims Bd., 502 U. S. 105, 127 (1991) (Kennedy, J., concurring in judgment)). Among these categories are advocacy intended, and likely, to incite imminent lawless action, see Brandenburg v. Ohio, 395 U. S. 444 (1969) (per curiam); obscenity, see, e. g., Miller v. California, 413 U. S. 15 (1973); defamation, see, e. g., New York Times Co. v. Sullivan, 376 U. S. 254 (1964) (providing substantial protection for speech about public figures); Gertz v. Robert Welch, Inc., 418 U. S. 323 (1974) (imposing some limits on liability for defaming a private figure); speech integral to criminal conduct, see, e. g., Giboney v. Empire Storage & Ice Co., 336 U. S. 490 (1949); so-called “fighting words,” see Chaplinsky v. New Hampshire, 315 U. S. 568 (1942); child pornography, see New York v. Ferber, 458 U. S. 747 (1982); fraud, see Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U. S. 748, 771 (1976); true threats, see Watts v. United States, 394 U. S. 705 (1969) (per curiam); and speech presenting some grave and imminent threat the government has the power to prevent, see Near v. Minnesota ex rel. Olson, 283 U. S. 697, 716 (1931), although a restriction under the last category is most difficult to sustain, see New York Times Co. v. United States, 403 U. S. 713 *718 (1971) (per curiam). These categories have a historical foundation in the Court’s free speech tradition. The vast realm of free speech and thought always protected in our tradition can still thrive, and even be furthered, by adherence to those categories and rules.
Absent from those few categories where the law allows content-based regulation of speech is any general exception to the First Amendment for false statements. This comports with the common understanding that some false statements are inevitable if there is to be an open and vigorous expression of views in public and private conversation, expression the First Amendment seeks to guarantee. See Sullivan, supra, at 271 (“Th[e] erroneous statement is inevitable in free debate”).
The Government disagrees with this proposition. It cites language from some of this Court’s precedents to support its contention that false statements have no value and hence no First Amendment protection. See also Brief for Eugene Volokh et al. as Amici Curiae 2-11. These isolated statements in some earlier decisions do not support the Government’s submission that false statements, as a general rule, are beyond constitutional protection. That conclusion would take the quoted language far from its proper context. For instance, the Court has stated “[f]alse statements of fact are particularly valueless [because] they interfere with the truth-seeking function of the marketplace of ideas,” Hustler Magazine, Inc. v. Falwell, 485 U. S. 46, 52 (1988), and that false statements “are not protected by the First Amendment in the same manner as truthful statements,” Brown v. Hartlage, 456 U. S. 45, 60-61 (1982). See also, e. g., Virginia Bd. of Pharmacy, supra, at 771 (“Untruthful speech, commercial or otherwise, has never been protected for its own sake”); Herbert v. Lando, 441 U. S. 153, 171 (1979) (“Spreading false information in and of itself carries no First Amendment credentials”); Gertz, supra, at 340 (“[T]here is no constitutional value in false statements of fact”); Garrison v. Louisiana, *719 379 U. S. 64, 75 (1964) (“[T]he knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection”).
These quotations all derive from cases discussing defamation, fraud, or some other legally cognizable harm associated with a false statement, such as an invasion of privacy or the costs of vexatious litigation. See Brief for United States 18-19. In those decisions the falsity of the speech at issue was not irrelevant to our analysis, but neither was it determinative. The Court has never endorsed the categorical rule the Government advances: that false statements receive no First Amendment protection. Our prior decisions have not confronted a measure, like the Stolen Valor Act, that targets falsity and nothing more.
Even when considering some instances of defamation and fraud, moreover, the Court has been careful to instruct that falsity alone may not suffice to bring the speech outside the First Amendment. The statement must be a knowing or reckless falsehood. See Sullivan, supra, at 280 (prohibiting recovery of damages for a defamatory falsehood made about a public official unless the statement was made “with knowledge that it was false or with reckless disregard of whether it was false or not”); see also Garrison, supra, at 73 (“[E]ven when the utterance is false, the great principles of the Constitution which secure freedom of expression . . . preclude attaching adverse consequences to any except the knowing or reckless falsehood”); Illinois ex rel. Madigan v. Telemarketing Associates, Inc., 538 U. S. 600, 620 (2003) (“False statement alone does not subject a fundraiser to fraud liability”).
The Government thus seeks to use this principle for a new purpose. It seeks to convert a rule that limits liability even in defamation cases where the law permits recovery for tor-tious wrongs into a rule that expands liability in a different, far greater realm of discourse and expression. That inverts the rationale for the exception. The requirements of a *720 knowing falsehood or reckless disregard for the truth as the condition for recovery in certain defamation cases exists to allow more speech, not less. A rule designed to tolerate certain speech ought not blossom to become a rationale for a rule restricting it.
The Government then gives three examples of regulations on false speech that courts generally have found permissible: first, the criminal prohibition of a false statement made to a Government official, 18 U. S. C. § 1001; second, laws punishing perjury; and third, prohibitions on the false representation that one is speaking as a Government official or on behalf of the Government, see, e. g., § 912; § 709. These restrictions, however, do not establish a principle that all proscriptions of false statements are exempt from exacting First Amendment scrutiny.
The federal statute prohibiting false statements to Government officials punishes “whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government . . . makes any materially false, fictitious, or fraudulent statement or representation.” § 1001. Section 100Ts prohibition on false statements made to Government officials, in communications concerning official matters, does not lead to the broader proposition that false statements are unprotected when made to any person, at any time, in any context.
The same point can be made about what the Court has confirmed is the “unquestioned constitutionality of perjury statutes,” both the federal statute, § 1623, and its state-law equivalents. United States v. Grayson, 438 U. S. 41, 54 (1978). See also Konigsberg v. State Bar of Cal., 366 U. S. 36, 49-50, n. 10 (1961). It is not simply because perjured statements are false that they lack First Amendment protection. Perjured testimony “is at war with justice” because it can cause a court to render a “judgment not resting on truth.” In re Michael, 326 U. S. 224, 227 (1945). Perjury undermines the function and province of the law and threat *721 ens the integrity of judgments that are the basis of the legal system. See United States v. Dunnigan, 507 U. S. 87, 97 (1993) (“To uphold the integrity of our trial system . . . the constitutionality of perjury statutes is unquestioned”)- Unlike speech in other contexts, testimony under oath has the formality and gravity necessary to remind the witness that his or her statements will be the basis for official governmental action, action that often affects the rights and liberties of others. Sworn testimony is quite distinct from lies not spoken under oath and simply intended to puff up oneself.
Statutes that prohibit falsely representing that one is speaking on behalf of the Government, or that prohibit impersonating a Government officer, also protect the integrity of Government processes, quite apart from merely restricting false speech. Title 18 U. S. C. § 912, for example, prohibits impersonating an officer or employee of the United States. Even if that statute may not require proving an “actual financial or property loss” resulting from the deception, the statute is itself confined to “maintain[ing] the general good repute and dignity of... government... service itself.” United States v. Lepowitch, 318 U. S. 702, 704 (1943) (internal quotation marks and alteration omitted). The same can be said for prohibitions on the unauthorized use of the names of federal agencies such as the Federal Bureau of Investigation (FBI) in a manner calculated to convey that the communication is approved, see § 709, or using words such as “Federal” or “United States” in the collection of private debts in order to convey that the communication has official authorization, see § 712. These examples, to the extent that they implicate fraud or speech integral to criminal conduct, are inapplicable here.
As our law and tradition show, then, there are instances in which the falsity of speech bears upon whether it is protected. Some false speech may be prohibited even if analogous true speech could not be. This opinion does not imply that any of these targeted prohibitions are somehow vulnera *722 ble. But it also rejects the notion that false speech should be in a general category that is presumptively unprotected.
Although the First Amendment stands against any “freewheeling authority to declare new categories of speech outside the scope of the First Amendment,” Stevens, 559 U. S., at 473, the Court has acknowledged that perhaps there exist “some categories of speech that have been historically unprotected . . . but have not yet been specifically identified or discussed ... in our case law.” Ibid. Before exempting a category of speech from the normal prohibition on content-based restrictions, however, the Court must be presented with “persuasive evidence that a novel restriction on content is part of a long (if heretofore unrecognized) tradition of proscription,” Brown v. Entertainment Merchants Assn., 564 U. S. 786, 792 (2011). The Government has not demonstrated that false statements generally should constitute a new category of unprotected speech on this basis.
III
The probable, and adverse, effect of the Act on freedom of expression illustrates, in a fundamental way, the reasons for the law’s distrust of content-based speech prohibitions.
The Act by its plain terms applies to a false statement made at any time, in any place, to any person. It can be assumed that it would not apply to, say, a theatrical performance. See Milkovich v. Lorain Journal Co., 497 U. S. 1, 20 (1990) (recognizing that some statements nominally purporting to contain false facts in reality “cannot reasonably be interpreted as stating actual facts about an individual” (internal quotation marks and brackets omitted)). Still, the sweeping, quite unprecedented reach of the statute puts it in conflict with the First Amendment. Here the lie was made in a public meeting, but the statute would apply with equal force to personal, whispered conversations within a home. The statute seeks to control and suppress all false *723 statements on this one subject in almost limitless times and settings. And it does so entirely without regard to whether the lie was made for the purpose of material gain. See San Francisco Arts & Athletics, Inc. v. United States Olympic Comm., 483 U. S. 522, 539-540 (1987) (prohibiting a nonprofit corporation from exploiting the “commercial magnetism” of the word “Olympic” when organizing an athletic competition (internal quotation marks omitted)).
Permitting the government to decree this speech to be a criminal offense, whether shouted from the rooftops or made in a barely audible whisper, would endorse government authority to compile a list of subjects about which false statements are punishable. That governmental power has no clear limiting principle. Our constitutional tradition stands against the idea that we need Oceania’s Ministry of Truth. See G. Orwell, Nineteen Eighty-Four (1949) (Centennial ed. 2003). Were this law to be sustained, there could be an endless list of subjects the National Government or the States could single out. Where false claims are made to effect a fraud or secure moneys or other valuable considerations, say, offers of employment, it is well established that the Government may restrict speech without affronting the First Amendment. See, e. g., Virginia Bd. of Pharmacy, 425 U. S., at 771 (noting that fraudulent speech generally falls outside the protections of the First Amendment). But the Stolen Valor Act is not so limited in its reach. Were the Court to hold that the interest in truthful discourse alone is sufficient to sustain a ban on speech, absent any evidence that the speech was used to gain a material advantage, it would give government a broad censorial power unprecedented in this Court’s cases or in our constitutional tradition. The mere potential for the exercise of that power casts a chill, a chill the First Amendment, cannot permit if free speech, thought, and discourse are to remain a foundation of our freedom.
*724 IV
The previous discussion suffices to show that the Act conflicts with free speech principles. But even when examined within its own narrow sphere of operation, the Act cannot survive. In assessing content-based restrictions on protected speech, the Court has not adopted a freewheeling approach, see Stevens, supra, at 470 (“The First Amendment’s guarantee of free speech does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits”), but rather has applied the “most exacting scrutiny,” Turner Broadcasting System, Inc. v. FCC, 512 U. S. 622, 642 (1994). Although the objectives the Government seeks to further by the statute are not without significance, the Court must, and now does, find the Act does not satisfy exacting scrutiny.
The Government is correct when it states military medals “serve the important public function of recognizing and expressing gratitude for acts of heroism and sacrifice in military service,” and also “‘foste[r] morale, mission accomplishment and esprit de corps’ among service members.” Brief for United States 37, 38. General George Washington observed that an award for valor would “cherish a virtuous ambition in . . . soldiers, as well as foster and encourage every species of military merit.” General Orders of George Washington Issued at Newburgh on the Hudson, 1782-1783 (Aug. 7, 1782), p. 30 (E. Boynton ed. 1883). Time has not diminished this idea. In periods of war and peace alike public recognition of valor and noble sacrifice by men and women in uniform reinforces the pride and national resolve that the military relies upon to fulfill its mission.
These interests are related to the integrity of the military honors system in general, and the Congressional Medal of Honor in particular. Although millions have served with brave resolve, the Medal, which is the highest military award for valor against an enemy force, has been given just 3,476 times. Established in 1861, the Medal is reserved for those *725 who have distinguished themselves “conspicuously by gallantry and intrepidity at the risk of his life above and beyond the call of duty.” 10 U. S. C. §§ 3741 (Army), 6241 (Navy and Marine Corps), 8741 (Air Force), 14 U. S. C. § 491 (Coast Guard). The stories of those who earned the Medal inspire and fascinate, from Dakota Meyer who in 2009 drove five times into the midst of a Taliban ambush to save 36 lives, see Curtis, President Obama Awards Medal of Honor to Dakota Meyer, The White House Blog (Sept. 15, 2011) (all Internet materials as visited June 25, 2012, and available in Clerk of Court’s case file); to Desmond Doss who served as an army medic on Okinawa and on June 5, 1945, rescued 75 fellow soldiers, and who, after being wounded, gave up his own place on a stretcher so others could bé taken to safety, see America’s Heroes 88-90 (J. Willbanks ed. 2011); to William Carney who sustained multiple gunshot wounds to the head, chest, legs, and arm, and yet carried the flag to ensure it did not touch the ground during the Union army’s assault on Fort Wagner in July 1863, id., at 44-45. The rare acts of courage the Medal celebrates led President Truman to say he would “rather have that medal round my neck than . . . be president of the United States.” Truman Gives No. 1 Medal to 15 Army Heroes, Washington Post, Oct. 13, 1945, p. 5. The Government’s interest in protecting the integrity of the Medal of Honor is beyond question.
But to recite the Government’s compelling interests is not to end the matter. The First Amendment requires that the Government’s chosen restriction on the speech at issue be “actually necessary” to achieve its interest. Entertainment Merchants Assn., 564 U. S., at 799. There must be a direct causal link between the restriction imposed and the injury to be prevented. See ibid. The link between the Government’s interest in protecting the integrity of the military honors system and the Act’s restriction on the false claims of liars like respondent has not been shown. Although appearing to concede that “an isolated misrepresen *726 tation by itself would not tarnish the meaning of military honors,” the Government asserts it is “common sense that false representations have the tendency to dilute the value and meaning of military awards,” Brief for United States 49, 54. It must be acknowledged that when a pretender claims the Medal to be his own, the lie might harm the Government by demeaning the high purpose of the award, diminishing the honor it confirms, and creating the appearance that the Medal is awarded more often than is true. Furthermore, the lie may offend the true holders of the Medal. From one perspective it insults their bravery and high principles when falsehood puts them in the unworthy company of a pretender.
Yet these interests do not satisfy the Government’s heavy burden when it seeks to regulate protected speech. See United States v. Playboy Entertainment Group, Inc., 529 U. S. 803, 818 (2000). The Government points to no evidence to support its claim that the public’s general perception of military awards is diluted by false claims such as those made by Alvarez. Cf. Entertainment Merchants Assn., supra, at 799-800 (analyzing and rejecting the findings of research psychologists demonstrating the causal link between violent video games and harmful effects on children). As one of the Government’s amici notes, “there is nothing that charlatans such as Xavier Alvarez can do to stain [the Medal recipients’] honor.” Brief for Veterans of Foreign Wars of the United States et al. as Amici Curiae 1. This general proposition is sound, even if true holders of the Medal might experience anger and frustration.
The lack of a causal link between the Government’s stated interest and the Act is not the only way in which the Act is not actually necessary to achieve the Government’s stated interest. The Government has not shown, and cannot show, why counterspeech would not suffice to achieve its interest. The facts of this case indicate that the dynamics of free speech, of counterspeech, of refutation, can overcome the lie. *727 Respondent lied at a public meeting. Even before the FBI began investigating him for his false statements “Alvarez was perceived as a phony,” 617 F. 3d, at 1211. Once the lie. was made public, he was ridiculed online, see Brief for Respondent 3, his actions were reported in the press, see Ortega, Alvarez Again Denies Claim, Ontario, Cal., Inland Valley Daily Bulletin (Sept. 27, 2007), and a fellow board member called for his resignation, see, e. g., Bigham, Water District Rep Requests Alvarez Resign in Wake of False Medal Claim, San Bernardino Cty., Cal., The Sun (May 21, 2008). There is good reason to believe that a similar fate would befall other false claimants. See Brief for Reporters Committee for Freedom of the Press et al. as Amici Curiae 30-33 (listing numerous examples of public exposure of false claimants). Indeed, the outrage and contempt expressed for respondent’s lies can serve to reawaken and reinforce the public’s respect for the Medal, its recipients, and its high purpose. The acclaim that recipients of the Congressional Medal of Honor receive also casts doubt on the proposition that the public will be misled by the claims of charlatans or become cynical of those whose heroic deeds earned them the Medal by right. See, e. g., Well Done, Washington Post, Feb. 5, 1943, p. 8 (reporting on President Roosevelt’s awarding the Congressional Medal of Honor to Maj. Gen. Alexander Vandegrift); Devroy, Medal of Honor Given to 2 Killed in Somalia, Washington Post, May 24, 1994, p. A6 (reporting on President Clinton’s awarding the Congressional Medal of Honor to two special forces soldiers killed during operations in Somalia).
The remedy for speech that is false is speech that is true. This is the ordinary course in a free society. The response to the unreasoned is the rational; to the uninformed, the enlightened; to the straight-out lie, the simple truth. See Whitney v. California, 274 U. S. 357, 377 (1927) (Brandéis, J., concurring) (“If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the proc *728 esses of education, the remedy to be applied is more speech, not enforced silence”)- The theory of our Constitution is “that the best test of truth is the power of the thought to get itself accepted in the competition of the market,” Abrams v. United States, 250 U. S. 616, 630 (1919) (Holmes, J., dissenting). The First Amendment itself ensures the right to respond to speech we do not like, and for good reason. Freedom of speech and thought flows not from the beneficence of the state but from the inalienable rights of the person. And suppression of speech by the government can make exposure of falsity more difficult, not less so. Society has the right and civic duty to engage in open, dynamic, rational discourse. These ends are not well served when the government seeks to orchestrate public discussion through content-based mandates.
Expressing its concern that counterspeeeh is insufficient, the Government responds that because “some military records have been lost... some claims [are] unverifiable,” Brief for United States 50. This proves little, however; for without verifiable records, successful criminal prosecution under the Act would be more difficult in any event. So, in cases where public refutation will not serve the Government's interest, the Act will not either. In addition, the Government claims that “many [false claims] will remain unchallenged.” Id., at 55. The Government provides no support for the contention. And in any event, in order to show that public refutation is not an adequate alternative, the Government must demonstrate that unchallenged claims undermine the public’s perception of the military and the integrity of its awards system. This showing has not been made.
It is a fair assumption that any true holders of the Medal who had heard of Alvarez’s false claims would have been fully vindicated by the community’s expression of outrage, showing as it did the Nation’s high regard for the Medal. The same can be said for the Government’s interest. The American people do not need the assistance of a government *729 prosecution to express their high regard for the special place that military heroes hold in our tradition. Only a weak society needs government protection or intervention before it pursues its resolve to preserve the truth. Truth needs neither handcuffs nor a badge for its vindication.
In addition, when the Government seeks to regulate protected speech, the restriction must be the “least restrictive means among available, effective alternatives.” Ashcroft, 542 U. S., at 666. There is, however, at least one less speech-restrictive means by which the Government could likely protect the integrity of the military awards system. A Government-created database could list Congressional Medal of Honor recipients. Were a database accessible through the Internet, it would be easy to verify and expose false claims. It appears some private individuals have already created databases similar to this, see Brief for Respondent 25, and at least one database of past recipients is online and fully searchable, see Congressional Medal of Honor Society, Full Archive, http://www.cmohs.org/recipient-archive.php. The Solicitor General responds that although Congress and the Department of Defense investigated the feasibility of establishing a database in 2008, the Government “concluded that such a database would be impracticable and insufficiently comprehensive.” Brief for United States 55. Without more explanation, it is difficult to assess the Government’s claim, especially when at least one database of Congressional Medal of Honor recipients already exists.
The Government may have responses to some of these criticisms, but there has been no clear showing of the necessity of the statute, the necessity required by exacting scrutiny.
[[Image here]]
The Nation well knows that one of the costs of the First Amendment is that it protects the speech we detest as well as the speech we embrace. Though few might find respondent’s statements anything but contemptible, his right to *730 make those statements is protected by the Constitution’s guarantee of freedom of speech and expression. The Stolen Valor Act infringes upon speech protected by the First Amendment.
The judgment of the Court of Appeals is affirmed.

It is so ordered.