STATE of Minnesota, Respondent,

v.

William Francis MELCHERT–
DINKEL, Appellant.

No. A11–0987.

Supreme Court of Minnesota.

March 19, 2014.

Lori Swanson, Attorney General, Saint Paul, MN; and G. Paul Beaumaster, Rice County Attorney, Terence Swihart, Assistant County Attorney, Benjamin Bejar, Assistant County Attorney, Faribault, MN, for respondent.

Terry A. Watkins, Watkins Law Office, LLC, Faribault, MN, for appellant.

Cort C. Holten, Jeffrey D. Bores, Chestnut Cambronne PA, Minneapolis, MN, for amicus curiae Minnesota Police and Peace Officers Association Legal Defense Fund.

Robert Rivas, Sachs Sax Caplan, P.L., Tallahassee, FL, for amici curiae Final Exit Network, Inc. and Jerry Dincin.

Kyle White, Saint Paul, MN, for amicus curiae National Alliance on Mental Illness of Minnesota.

## OPINION

ANDERSON, Justice.

After communicating with appellant William Melchert–Dinkel, Mark Drybrough and Nadia Kajouji each committed suicide. This appeal presents the issue of whether the State of Minnesota may, consistent with the First Amendment, prosecute Melchert–Dinkel for advising, encouraging, or assisting another in committing suicide in violation of Minn.Stat. § 609.215, subd. 1 (2012), which makes it illegal to "intentionally advise[ ], encourage[ ], or assist[ ] an-

other in taking the other's own life." We conclude that the State may prosecute Melchert–Dinkel for assisting another in committing suicide, but not for encouraging or advising another to commit suicide.[1] Because the district court did not make a specific finding on whether Melchert–Dinkel assisted the victims' suicides, we remand for further proceedings consistent with this opinion.

Melchert–Dinkel, a resident of Faribault, was convicted of two counts of aiding suicide under Minn.Stat. § 609.215, subd. 1. Posing as a depressed and suicidal young female nurse, Melchert–Dinkel responded to posts on suicide websites by Mark Drybrough of Coventry, England, and Nadia Kajouji of Ottawa, Canada. In each case, he feigned caring and understanding to win the trust of the victims while encouraging each to hang themselves, falsely claiming that he would also commit suicide, and attempting to persuade them to let him watch the hangings via webcam.

Drybrough, who was 32 years old at the time Melchert–Dinkel contacted him in 2005, had suffered from significant mental and physical health problems for many years, including a condition that was "like having [the] flu all the time." His contact with Melchert–Dinkel began after the appellant responded to Drybrough's posting in an online forum about suicide asking about methods to commit suicide by hanging without "access to anything high up to tie the rope to." Melchert–Dinkel described how to commit suicide by hanging by tying a rope to a doorknob and slinging the rope over the top of the door.

---

1. For purposes of this opinion, we use the phrasing of encouraging or advising another *to* commit suicide interchangeably with the statutory language of advising or encouraging "another *in* taking the other's own life." Minn.Stat. § 609.215, subd. 1 (emphasis added).

In a series of online conversations with Melchert–Dinkel, Drybrough described an existence in which he was trapped between a life so miserable he wanted to end it, and the fear, uncertainty, and even occasional bouts of hope for a better future that prevented him from following through on his suicidal thoughts. Drybrough described practicing the hanging method Melchert–Dinkel taught him, but he was unable to fully commit and worried about his parents seeing the marks on his neck. Through all of this, Melchert–Dinkel presented himself as a compassionate and caring nurse, who not only could relate to Drybrough's misery, but also could provide practical advice due to her medical experience. He told Drybrough that he hoped "to be a [friend] at the end for you [as you] are for me." In Drybrough's last message, sent on July 23, 2005, he told Melchert–Dinkel that he was scared:

> I keep holding on to the hope that things might change.... I'm dying but slowly, day by day. I don't want to waste [anyone's] time. If you want someone who's suicidal, I'm just not there yet. You either do it or you don't, and I don't and [haven't]. [I'm] used to being alone. Sorry. I admire your courage, I wish I had it.

Drybrough hanged himself four days later.

On March 1, 2008, 19–year–old Nadia Kajouji of Ottawa, Canada, posted a message on a suicide website asking for advice on suicide methods that would be quick, reliable, and appear to be an accident to her family and friends. Five days later, Melchert–Dinkel responded, pretending to be a 31–year–old emergency room nurse who was also suicidal. Again, he presented himself as a caring and compassionate friend who understood Kajouji's plight and wanted to help.

Kajouji described her plan to jump off a bridge into a hole in the ice covering the river below while wearing ice skates, which she hoped would make her death look like an accident. Melchert–Dinkel tried repeatedly to dissuade her from her plan and convince her instead to hang herself. He also made oblique attempts to persuade her to kill herself immediately, saying they "would die today if we could" and "I wish [we both] could die now."

Melchert–Dinkel had a short instant message conversation with Kajouji on March 9, in which Kajouji informed him that she would be following through with her bridge-jumping plan later that night. Melchert–Dinkel suggested hanging one last time and claimed that he would be committing suicide the next day. Kajouji sent an e-mail to her roommates that night saying that she was going ice-skating. She was never seen again. Six weeks later, her body, ice skates still attached, was found in the river.

After being contacted by an individual concerned about an online predator who was encouraging people to commit suicide by hanging, Minnesota law enforcement officials eventually determined that both Drybrough and Kajouji had engaged in e-mail and chat communications with someone using different accounts but the same IP address. They tracked the address to Melchert–Dinkel's computer, and after initially blaming his daughters, Melchert–Dinkel confessed to communicating with Drybrough and Kajouji.

Melchert–Dinkel was tried in the Rice County District Court on two counts of aiding suicide under Minn.Stat. § 609.215, subd. 1. He agreed to a stipulated facts trial to preserve his right to appeal his convictions based on sufficiency of the evidence. The district court found him guilty on both counts. The district court specifically found that Melchert–Dinkel "intentionally *advised* and *encouraged* " both Drybrough and Kajouji to take their own

lives, concluding that the speech at issue fell outside the protections of the First Amendment. *State v. Melchert–Dinkel*, No. 66–CR–10–1193, Order at 28, 32 (Rice Cnty. Dist. Ct. filed March 15, 2011) (emphasis added).

On appeal to the court of appeals, Melchert–Dinkel argued that Minn.Stat. § 609.215, subd. 1, violates the First Amendment on its face and as applied to his specific speech. The State argued that, on its face, the statute prohibits speech that is not protected by the First Amendment—specifically speech that is "integral to [an] unlawful act" or that "imminently incites lawless conduct." Additionally, the State argued that, even if the statute reaches some speech that is protected by the First Amendment, the statute is constitutional because it is narrowly tailored to serve the State's compelling interests in preserving life and protecting vulnerable members of society. Concluding that "speech that intentionally advises, encourages, or assists another to commit suicide is an integral part" of both "the criminal conduct of physically assisting suicide" and another person's suicide, which is "harmful conduct that the state opposes as a matter of public policy," the court of appeals held that Minn.Stat. § 609.215, subd. 1, prohibits speech that is unprotected by the First Amendment. *State v. Melchert–Dinkel*, 816 N.W.2d 703, 714 (Minn.App.2012). The court of appeals also held that there is "no apparent unconstitutional overbreadth because the statute covers so little, and the broad arena of pro-suicide speech not proscribed by the statute includes the full spectrum of social or political communication on the topic."

*Id.* at 715. Melchert–Dinkel filed a petition for review, which we granted.[2]

The question before us is whether the State can, consistent with the First Amendment, prosecute Melchert–Dinkel for assisting, advising, or encouraging another in committing suicide. For the reasons set forth below, we conclude that the State may prosecute Melchert–Dinkel for assisting another in committing suicide, but not for encouraging or advising another to commit suicide.

## I.

We review the constitutionality of statutes de novo. *Associated Builders & Contractors v. Ventura*, 610 N.W.2d 293, 298 (Minn.2000). The State bears the burden of showing that a content-based restriction on speech does not violate the First Amendment. *State v. Casino Mktg. Grp., Inc.*, 491 N.W.2d 882, 885–86 (Minn. 1992).

The First Amendment to the U.S. Constitution, which applies to the states through the Fourteenth Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech. . . ." U.S. Const. amend. I; *Gitlow v. New York*, 268 U.S. 652, 666, 45 S.Ct. 625, 69 L.Ed. 1138 (1925). As a general matter, the amendment establishes that "above all else," the government "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). Allowing the government to restrict expressive activity because of its content "would completely undercut the

---

2. After we granted review and granted leave to some parties to appear as amici, the State moved to strike the amicus brief filed by Final Exit Network, Inc. and Jerry Dincin because that brief did not support the State's position in this case. Without deciding whether the

Final Exit Network's brief was timely, Minn. R. Civ.App. P. 129.02, we note that the brief complied with the requirement to "indicate whether [it] . . . suggest[s] affirmance or reversal." Minn. R. Civ.App. P. 129.01. We therefore deny the motion to strike.

'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Id.* at 96, 92 S.Ct. 2286 (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). One example of a content-based restriction of speech is when the decision of whether to prosecute an individual depends entirely on what he or she says. *State v. Crawley,* 819 N.W.2d 94, 101 (Minn.2012) (citing *Holder v. Humanitarian Law Project,* 561 U.S. 1, 130 S.Ct. 2705, 2712, 2723–24, 177 L.Ed.2d 355 (2010)).

■ But the Supreme Court has long permitted some content-based restrictions in a few limited areas, in which speech is "of such slight social value as a step to truth that any benefit that may be derived from [it] is clearly outweighed by the social interest in order and morality." *Chaplinsky v. New Hampshire,* 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). Among the traditional exceptions to the First Amendment are speech integral to criminal conduct, *Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490, 498, 69 S.Ct. 684, 93 L.Ed. 834 (1949), incitement, *Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969), and fraud, *Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.,* 538 U.S. 600, 612, 123 S.Ct. 1829, 155 L.Ed.2d 793 (2003). The State asserts that the speech at issue is unprotected because it falls under each of these three exceptions, which we now consider in turn.

### A.

■ The State first argues that, on its face, Minn.Stat. § 609.215, subd. 1, proscribes speech that falls under the "speech integral to criminal conduct" exception to the First Amendment. We disagree.

The Supreme Court has held that the First Amendment's protections do not extend to "speech or writing used as an integral part of conduct in violation of a valid criminal statute." *Giboney,* 336 U.S. at 498, 69 S.Ct. 684. In *Giboney,* the Court upheld an injunction against union picketing, by which the union was attempting to compel a wholesale distributor to sign an agreement that would have violated Missouri's antitrust laws. *Id.* at 492–93, 504, 69 S.Ct. 684. The Court based its holding on the fact that the "sole, unlawful immediate objective [of the picketing] was to induce [the distributor] to violate the Missouri law by acquiescing in unlawful demands to agree not to sell ice to non-union peddlers." *Id.* at 502, 69 S.Ct. 684; *see also New York v. Ferber,* 458 U.S. 747, 761–62, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982) (excluding the advertising and sale of child pornography from First Amendment protection partly because these activities were an "integral part" of its unlawful production).

Minnesota Statutes § 609.215, subd. 1, provides that "[w]hoever intentionally advises, encourages, or assists another in taking the other's own life may be sentenced to imprisonment for not more than 15 years or to payment of a fine of not more than $30,000, or both." While suicide itself was once a criminal offense in Minnesota, the Legislature repealed the statute criminalizing it in 1911. Act of April 20, 1911, ch. 293, 1911 Minn. Laws 409, 409. Suicide also is no longer a crime in the United Kingdom or Canada. *See* Suicide Act 1961, 9 Eliz. 2, c. 60, § 1 (U.K.); *Rodriguez v. British Columbia (Attorney General),* [1993] 3 S.C.R. 519, 597–98 (Can.) (discussing the decriminalization of attempted suicide). Thus, the major challenge with applying the "speech integral to criminal conduct" exception is that suicide is not illegal in any of the jurisdictions at issue. The holding in *Giboney* specifically stated that the exception was for speech integral to conduct "in vio-

lation of a *valid criminal statute,*" and there is no valid statute criminalizing suicide here. *Giboney,* 336 U.S. at 498, 69 S.Ct. 684 (emphasis added). It is true, as the court of appeals noted, that "suicide, despite no longer being illegal in Minnesota, remains harmful conduct that the state opposes as a matter of public policy." *Melchert–Dinkel,* 816 N.W.2d at 714. But the Supreme Court has never recognized an exception to the First Amendment for speech that is integral to merely harmful conduct, as opposed to illegal conduct.

Applying the "speech integral to criminal conduct" exception to harmful conduct would be an expansion of the exception, and following the guidance of the Supreme Court, we are wary of declaring any new categories of speech that fall outside of the First Amendment's umbrella protections. *See Brown v. Entm't Merchs. Ass'n,* —— U.S. ——, 131 S.Ct. 2729, 2734, 180 L.Ed.2d 708 (2011) ("[W]ithout persuasive evidence that a novel restriction on content is part of a long (if heretofore unrecognized) tradition of proscription, a legislature may not revise the judgment of the American people, embodied in the First Amendment, that the benefits of its restrictions on the Government outweigh the costs." (citations omitted) (internal quotation marks omitted)); *United States v. Stevens,* 559 U.S. 460, 472, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010) (stating that the Supreme Court "cases cannot be taken as establishing a freewheeling authority to declare new categories of speech outside the scope of the First Amendment"). Accordingly, we reject the court of appeals' approach, which expanded the "speech integral to criminal conduct" exception to include speech integral to "harmful, proscribable conduct." *See Melchert–Dinkel,* 816 N.W.2d at 713.

The State urges us to hold, as did the court of appeals, that the "speech integral

to criminal conduct" exception applies here because speech that intentionally advises, encourages, or assists another in committing suicide "is an integral part of the criminal conduct of physically assisting suicide." *Id.* at 714. But the statute, on its face, does not require a person to *physically* assist the suicide. In the absence of a physical-assistance requirement, the analysis proposed by the State is circular because it effectively upholds the statute on the ground that the speech prohibited by section 609.215 is an integral part of a violation of section 609.215. Accordingly, we reject the State's argument that the "speech integral to criminal conduct" exception to the First Amendment applies here.

### B.

■ The State next argues that, on its face, Minn.Stat. § 609.215, subd. 1, proscribes speech that falls under the "incitement" exception to the First Amendment. We again disagree.

The First Amendment only allows states to forbid advocating for someone else to break the law when such advocacy is both "directed to inciting or producing imminent lawless action" and it is "likely to incite or produce such action." *Brandenburg,* 395 U.S. at 447, 89 S.Ct. 1827. Mere "advocacy of illegal action at some indefinite future time" is "not sufficient to permit the State to punish" speech. *Hess v. Indiana,* 414 U.S. 105, 108, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973).

The State argues that we should focus on the "imminence" requirement and conclude that "imminent" does not necessarily mean "immediate," and that, in any event, Melchert–Dinkel's conduct would qualify even under an "immediate" standard. Even if that were true, again the obvious problem is that suicide is no longer a criminal act in any jurisdiction relevant to

this matter. It is difficult to articulate a rule consistent with the First Amendment that punishes an individual for "inciting" activity that is not actually "lawless action." Thus, the State's argument fails because suicide is not unlawful and cannot be considered "lawless action." Accordingly, we reject the State's argument that the "incitement" exception to the First Amendment applies here.

## C.

■ Finally, the State argues that, as applied to Melchert–Dinkel, Minn.Stat. § 609.215, subd. 1, does not violate the First Amendment because his communications with the victims involved "deceit, fraud, and lies," and therefore the speech used by Melchert–Dinkel falls under the "fraud" exception to the First Amendment. We again disagree.

There is no dispute as to either the depravity of Melchert–Dinkel's conduct or the fact that he lied to his victims. But to the extent the State argues that Melchert–Dinkel's speech is unprotected simply because he was lying, the argument fails. A plurality of the Supreme Court has recognized that speech is not unprotected simply because the speaker knows that he or she is lying. *United States v. Alvarez,* —— U.S. ——, 132 S.Ct. 2537, 2545–47, 183 L.Ed.2d 574 (2012) (plurality opinion) (striking down a statute that criminalized lying about the receipt of military decorations or medals). Allowing the government to declare false speech to be a criminal offense would allow governments to compile "an endless list of subjects the National Government or the States could single out." *Id.* at ——, 132 S.Ct. at 2547.

To the extent the State argues that Melchert–Dinkel's speech is unprotected because it amounted to fraud, that argument fails as well. As a plurality of the Court recognized in *Alvarez,* the government can restrict speech when false claims are made to "gain a material advantage," including money or "other valuable considerations," such as offers of employment. *Id.* at ——, 132 S.Ct. at 2547–48. But there are a multitude of scenarios in which the speech prohibited by Minn.Stat. § 609.215, subd. 1, would not be fraudulent, and thus this exception does not protect the statute from a facial challenge. Furthermore, we fail to see how, even under the unusual facts of this case, Melchert–Dinkel gained a material advantage or valuable consideration from his false speech. Accordingly, we reject the State's argument that the "fraud" exception to the First Amendment applies here.[3]

## II.

■■ The fact that the State's unprotected-speech arguments are unavailing does not end our inquiry. The government can still proscribe protected speech if it can show that the restriction passes "strict scrutiny," meaning that the law (1) is justified by a compelling government interest and (2) is narrowly drawn to serve that interest. *Brown,* —— U.S. at ——, 131 S.Ct. at 2738. The State "must specifically identify an actual problem in need of solving, and the curtailment of free speech must be actually necessary to the solution." *Id.* (citations omitted) (internal quotation marks omitted). In other words, "[t]here must be a direct causal link be-

---

**3.** We recognize that speech may also fall in a heretofore unrecognized category of unprotected First Amendment speech. *See Stevens,* 559 U.S. at 472, 130 S.Ct. 1577 (acknowledging the possibility that there "are some categories of speech that have been historical-ly unprotected, but have not yet been specifically identified or discussed as such in our case law"). But given that this argument was not made in this appeal, we decline to address the possibility of additional categories of unprotected speech here.

tween the restriction imposed and the injury to be prevented." *Alvarez,* —— U.S. at ——, 132 S.Ct. at 2549.

Minnesota Statute § 609.215, subd. 1, prohibits a person from assisting, advising, or encouraging another in committing suicide. The State has satisfied the first prong of the strict scrutiny test because the State has a compelling interest in preserving human life.[4] *See Planned Parenthood Ass'n of Kansas City v. Ashcroft,* 462 U.S. 476, 485, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983). With regard to the second prong of the strict scrutiny test, we consider whether the prohibitions against assisting, advising, or encouraging are narrowly drawn to serve the State's interest in preserving human life, beginning with the prohibition against "assist[ing]" another to commit suicide.

### A.

Although the U.S. Supreme Court has never considered a First Amendment challenge to a statutory prohibition against assisting another in committing suicide, the Court did reject a due process challenge to a statute that prohibited a person from knowingly causing or aiding another person to attempt suicide in *Washington v. Glucksberg,* 521 U.S. 702, 707, 735, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997). The Court in *Glucksberg* noted that the law had historically rejected, rather than protected, attempts to permit assisted suicide. *Id.* at 723, 728, 117 S.Ct. 2258. The Court, therefore, reasoned that the right to assistance in committing suicide is not specially protected as a fundamental liberty interest that is " 'deeply rooted in this Nation's

history and tradition' " *Id.* at 721, 117 S.Ct. 2258 (quoting *Moore v. City of E. Cleveland,* 431 U.S. 494, 503, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (plurality opinion)). The *Glucksberg* Court went on to conclude that there was no question that the prohibition against causing or aiding suicide was rationally related to the State's legitimate interest in preserving human life, protecting vulnerable groups, protecting the integrity of the medical profession, and avoiding the path towards voluntary or involuntary euthanasia. *Glucksberg,* 521 U.S. at 728–34, 117 S.Ct. 2258. We acknowledge that *Glucksberg* is not controlling here because it involved an application of the rational basis test in the context of a due process challenge. Nevertheless, the *Glucksberg* Court's emphatic statement that the rational basis test was "unquestionably met," *id.* at 728, 117 S.Ct. 2258 suggests that a properly tailored prohibition against assisting suicide might survive a higher level of scrutiny.

Keeping in mind the historical background and legal principles set forth in *Glucksberg,* we turn to the statutory prohibition against assisting another in committing suicide. We note first that section 609.215 prohibits assisting, advising, or encouraging "another in taking the other's own life." The use of the word "another," which refers to an individual, rather than "others," which would refer to a larger audience, shows that the Legislature intended for this statute only to reach directly targeted speech aimed at a specific individual. The requirement that the speech be aimed at a particular individual

**4.** This compelling interest in preserving human life by preventing suicide is illustrated, in part, by the amicus brief filed by National Alliance on Mental Illness of Minnesota. The brief notes that in 2010 there were more than 38,000 suicides in the United States, including 599 suicides in Minnesota. Suicide was the second leading cause of death for people aged 10 to 24 that year. The brief also reports that about 15 percent of Americans will suffer clinical depression at some point and 30 percent of all clinically depressed patients attempt suicide. We have no doubt that suicide is a significant public health concern.

narrows the reach of the statute significantly, as it excludes any general public discussion on the topic of suicide from penalty.[5]

■ The restriction on speech is also narrowed by the term "assists" itself. Minnesota Statutes § 609.215, subd. 1, does not define the word "assists." In the absence of an applicable statutory definition, we generally give statutory terms their common and ordinary meanings. *See State v. Leathers*, 799 N.W.2d 606, 609 (Minn.2011) (citing Minn.Stat. § 645.08 (2010)). The ordinary definition of the verb "assist" is "help," which in turn is defined as to "provide (a person etc.) with what is needed for a purpose." *The New Shorter Oxford English Dictionary* 132, 1216 (1993). Consistent with the plain language of the statute, we therefore conclude that the "assist[ ]" prohibition of section 609.215, subdivision 1, proscribes speech or conduct that provides another person with what is needed for the person to commit suicide. This signifies a level of involvement in the suicide beyond merely expressing a moral viewpoint or providing general comfort or support. Rather, "assist," by its plain meaning, involves enabling the person to commit suicide. While enablement perhaps most obviously occurs in the context of physical assistance, speech alone may also enable a person to commit suicide. Here, we need only note that speech instructing another on suicide methods falls within the ambit of constitutional limitations on speech that assists another in committing suicide.

Prohibiting only speech that assists suicide, combined with the statutory limitation that such enablement must be targeted at a specific individual, narrows the reach to only the most direct, causal links between speech and the suicide. We thus conclude that the proscription against "assist[ing]" another in taking the other's own life is narrowly drawn to serve the State's compelling interest in preserving human life. We therefore reject Melchert–Dinkel's argument that the statutory prohibition against assisting another in committing suicide facially violates the First Amendment.

### B.

■ Our conclusion that the statutory prohibition against assisting another in committing suicide survives strict scrutiny does not end our analysis because section 609.215, subdivision 1, also prohibits "advis[ing]" and "encourag[ing]" another to commit suicide. The statute does not define "advises" or "encourages." As mentioned earlier, in the absence of applicable statutory definitions, we generally give statutory terms their ordinary and common meanings. *See Leathers*, 799 N.W.2d at 609. The ordinary definition of the verb "advise" is to "[i]nform." *The New Shorter Oxford English Dictionary* 32 (1993). The ordinary definition of the verb "encourage" is to "[g]ive courage, confidence, or hope." *Id.* at 814.

Unlike the definition of "assist," nothing in the definitions of "advise" or "encourage" requires a direct, causal connection to a suicide. While the prohibition on assisting covers a range of conduct and limits only a small amount of speech, the common definitions of "advise" and "encourage" broadly include speech that provides support or rallies courage. Thus, a prohibition on advising or encouraging includes speech that is more tangential to the act of

---

**5.** This narrowing resolves the concerns of the dissent that the rule announced today would prohibit the publication of books that describe successful suicidal behavior. The statute is only concerned with speech directly targeted at an individual, not speech made in public discourse.

suicide and the State's compelling interest in preserving life than is speech that "assists" suicide. Furthermore, the "advise[ ]" and "encourage[ ]" prohibitions are broad enough to permit the State to prosecute general discussions of suicide with specific individuals or groups. Speech in support of suicide, however distasteful, is an expression of a viewpoint on a matter of public concern, and, given current U.S. Supreme Court First Amendment jurisprudence, is therefore entitled to special protection as the " 'highest rung of the hierarchy of First Amendment values.' " *Snyder v. Phelps,* —— U.S. ——, 131 S.Ct. 1207, 1215, 179 L.Ed.2d 172 (2011) (quoting *Connick v. Myers,* 461 U.S. 138, 145, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). Therefore, because the "advise[ ]" and "encourage[ ]" prohibitions are not narrowly drawn to serve the State's compelling interest in preserving human life, we conclude that they do not survive strict scrutiny.

### C.

We must next determine if we can sever the offending portions of the statute while leaving other portions of the statute intact.

■■■■ When deciding severability issues we, insofar as possible, attempt to "effectuate the intent of the legislature had it known that a provision of the law was invalid." *State v. Shattuck,* 704 N.W.2d 131, 143 (Minn.2005). We are to presume that statutes are severable unless the Legislature has specifically stated otherwise. Minn.Stat. § 645.20 (2012) ("Unless there is a provision in the law that the provisions shall not be severable, the provisions of all laws shall be severable."). We also attempt to retain as much of the original statute as possible while striking the portions that render the statute unconstitutional. *Shattuck,* 704 N.W.2d at 143.

■■■ Severing unconstitutional provisions is permissible unless we conclude that one of two exceptions applies. *Id.* First, a statute cannot be severed if we determine that the valid provisions "are so essentially and inseparably connected with, and so dependent upon, the void provisions" that the Legislature would not have enacted the valid provisions without the voided language. *Id.* Second, we are not to sever a statute if "the remaining valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent." *Id.*

■■■ Because the Legislature did not specifically instruct otherwise, we presume the Legislature intended for Minn.Stat. § 609.215, subd. 1, to be severable, so the prohibition against assisting suicide remains valid unless it is inseparable from or incomplete without the prohibitions against advising and encouraging another to commit suicide. As discussed earlier, assisting is a separate and distinct concept from advising or encouraging, and therefore it is neither dependent on nor incomplete without the other terms. Further, a statute that only prohibits assistance is still capable of execution in accordance with legislative intent, and because a substantial part of the original statute remains, we conclude this result is what the Legislature would have wanted if it had known the other portions were unconstitutional. Therefore, we sever and excise the portions of Minn.Stat. § 609.215 that pertain to advising or encouraging, but leave intact the "assist[ing]" portions of the statute.

### III.

Having decided that the words "advises" and "encourages" must be severed from the statute, we turn next to Melchert–Dinkel's conviction.[6] The district court

---

6. Contrary to the dissent's assertion that this

was "an advise-or-encourage" case, evidence

found, and the court of appeals affirmed, that Melchert–Dinkel "intentionally advised and encouraged" both Mark Drybrough and Nadia Kajouji in taking their own lives. The district court, understandably, made no findings as to whether Melchert–Dinkel's actions also constituted assisting the victims in taking their own lives.[7] Because Melchert–Dinkel was found guilty, and convicted, under the portions of the statute that we have now excised as unconstitutional, but not under the remaining constitutional portion of the statute, we reverse Melchert–Dinkel's conviction and remand to the district court for proceedings consistent with this opinion.[8]

Reversed and remanded.

WRIGHT, J., took no part in the consideration or decision of this case.

LILLEHAUG, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

PAGE, Justice (dissenting).

I agree with the court's rationale and holding that the words "advises" and "encourages" must be severed from Minn. Stat. § 609.215, subd. 1 (2012), as unconstitutional. I disagree, however, with the court's remand to the district court for a determination of whether Melchert–Dinkel's actions constitute "assist[ing]" Mark Drybrough and Nadia Kajouji in taking their own lives for three reasons. First, the evidence presented at trial was insufficient to prove beyond a reasonable doubt that Melchert–Dinkel actually "assist[ed]" Drybrough's and Kajouji's suicides. Second, from the very beginning of this prosecution, the State's case has focused on whether Melchert–Dinkel "advise[d]" or "encourage[d]" Drybrough and Kajouji to commit suicide, not whether he "assist[ed]" their suicides. Third, because the record demonstrates that the district court deliberately omitted the word "assisted" from its finding that Melchert–Dinkel "intentionally advised and encouraged" Drybrough and Kajouji in taking their own lives, a remand will be a waste of scarce judicial resources.

I.

Minnesota Statutes § 609.215, subd. 1, prohibits "advis[ing], encourag[ing], or assist[ing]" another person's suicide. Minn.

---

was presented at trial on all three actions listed in the statute, including evidence that Melchert–Dinkel assisted in the suicides. The statement of probable cause in the complaint repeatedly uses the term "assists," including a statement from Melchert–Dinkel that "he had assisted 5 or less individuals in killing themselves." Both parties also used language of assistance in their statements to the court, including, as the dissent concedes, the State's request that the judge find Melchert–Dinkel guilty of "assisting, encouraging, and advising" both victims. Because both parties proceeded at trial as if "assisted" was part of the complaint for both victims, and even now do not make any argument that Melchert–Dinkel was not charged with assisting in the suicides, the record does not support the dissent's characterization of the case.

7. Although the dissent labels the omission of a finding on assistance "deliberate," we find no evidence to support this characterization. Rather, the evidence shows that the judge used the terms advise, encourage, assist, and aid inconsistently, with no clear distinctions between the terms. For example, at sentencing, the judge stated that Melchert–Dinkel was guilty of "two counts of aiding" suicide, a term broad enough to encompass advise, encourage, and assist, and he also referred to "Count 1 involving the *assisted* suicide of Mark Drybrough." (Emphasis added.)

8. The dissent argues that there was insufficient evidence presented at trial to prove that Melchert–Dinkel assisted in the suicides of either Drybrough or Kajouji. This analysis presumes a narrower definition of "assist" than the one we announce today.

Stat. § 609.215, subd. 1. In my view, the court misconstrues the meaning of the word "assists" as used in section 609.215. Moreover, when the word "assists" is given its proper meaning, there is no doubt that the State failed to present any evidence that Melchert–Dinkel "assist[ed]" Drybrough and Kajouji in their suicides.

"[A] statute is to be construed, if possible, so that no word, phrase, or sentence is superfluous, void, or insignificant." *Boutin v. LaFleur*, 591 N.W.2d 711, 716 (Minn. 1999) (citation omitted) (internal quotation marks omitted). Additionally, the "meaning of doubtful words in a legislative act may be determined by reference to their association with other associated words and phrases." *State v. Suess*, 236 Minn. 174, 182, 52 N.W.2d 409, 415 (1952).

The court acknowledges that the most obvious form of assistance is physical assistance, but concludes that the defendant's speech is enough to support a finding that the defendant assisted the victim's suicide. This interpretation is inconsistent with well-established law, including *Boutin*, 591 N.W.2d at 716, because such an interpretation renders the word "assists" superfluous by conflating its meaning with the words "encourages" and "advises." Moreover, the court's avoidance of the dictionary definition of the word "assist" is telling. The court's analysis relies on the definition of the word "help," a word not used in the language of the statute. The same dictionary that the court relies on for the meaning of "help" defines "assist" as "[a]n *act* of helping" and to help "a person in necessity; an action, process, or result." *The New Shorter Oxford English Dictionary* 132 (1993) (emphasis added). Thus, the word "assists" as used in section

609.215 requires an *action* more concrete than speech instructing another on suicide methods. To hold otherwise arguably criminalizes the publication of books that simply describe successful suicidal behavior.[9] I would interpret "assists" to require an action that furthers the suicide, such as providing materials or physically assisting the suicide. My interpretation is not only consistent with the dictionary definition of "assist," it does not render the word "assists" superfluous or criminalize the publication of books that simply describe successful suicidal behavior.

Although I agree that Melchert–Dinkel encouraged and advised the victims, he did not take any concrete action to assist in Drybrough's and Kajouji's tragic suicides. Because the State did not present any evidence that Melchert–Dinkel engaged in any act other than pure speech, I conclude that the State's evidence was insufficient to prove beyond a reasonable doubt that Melchert–Dinkel assisted their suicides. Consequently, Minn.Stat. § 609.035, subd. 1 (2012), clearly precludes further prosecution. Moreover, having obtained a conviction for encouraging and advising the suicides, the State is not entitled to a second bite at the apple on remand. A remand will do nothing more than waste judicial resources.

## II.

Minnesota Statutes § 609.035, subd. 1, also precludes remand to the district court for another reason. That section states "[a]ll the offenses, if prosecuted, shall be included in one prosecution which shall be stated in separate counts." Minn.Stat. § 609.035, subd. 1. From the very beginning of this prosecution, the State's case

---

9. Footnote 4 of the court's opinion is curious. The footnote suggests, correctly, that a narrow construction may save a statute from constitutional infirmity. The problem here is

that by interpreting the word "assist[ ]" to include pure speech, the court broadens and expands, rather than narrows the word "assists" as found in Minn.Stat. § 609.215.

focused on whether Melchert–Dinkel "advise[d]" or "encourage[d]" the victims to commit suicide, not whether he "assist[ed]" their suicides. More specifically, count one of the complaint reads:

> On or about July 27, 2005, within the County of Rice, defendant William Francis Melchert–Dinkel did advise, encourage, or assist another in taking the other's own life, to-wit: *did advise and encourage* Mark Drybrough, of Coventry, UK, using internet correspondence, and Mark Drybrough did take his own life.

(Emphasis added.) Similarly, count two of the complaint reads:

> On or about March 9–10, 2008, within the County of Rice, defendant William Francis Melchert–Dinkel did advise and encourage another in taking the other's own life, to-wit: *did advise and encourage* Nadia Kajouji of Ottawa, Ontario, Canada using internet correspondence and Nadia Kajouji did take her own life.

(Emphasis added.) Admittedly, the State's closing argument referenced all three means of aiding suicide: advising, encouraging and assisting.[10] Nevertheless, when the State's case is viewed as a whole, including the language of the complaint and the evidence presented at trial, it leads to the unmistakable conclusion that this was an advise-or-encourage case.[11] On that basis, it is wholly inappropriate to remand an advise-or-encourage case to the district court for a determination of whether Melchert–Dinkel's actions constitute "assist[ing]."

### III.

Finally, I would not remand to the district court because the record demonstrates that the district court deliberately omitted the word "assist" from its factual findings. The district court specifically found that, as to both counts, Melchert–Dinkel "intentionally advised and encouraged" Drybrough and Kajouji in taking their own lives. The word "assist" is plainly omitted from the district court's decision. It is true that, if a district court omits a finding on any issue of fact essential to sustain the general finding of guilt, the court shall be deemed to have made a finding consistent with the general finding. Minn. R.Crim. P. 26.01, subd. 2(e); *State v. Holliday*, 745 N.W.2d 556, 562 (Minn. 2008). But here, a finding that Melchert–Dinkel "assisted" was not an essential fact required to sustain the general finding of guilt because assisting was only one of three means by which Melchert–Dinkel could have committed the offense of aiding suicide. Having found that Melchert–Dinkel had advised and encouraged Drybrough and Kajouji to commit suicide, a finding that he also assisted was not essential to the general finding of guilt. The record in this case demonstrates that the

---

10. In its closing argument, the State said, "I'm asking this Court to find Mr. Melchert Dinkel guilty on both counts: Count 1 for the intentional advising and encouraging and assisting of Mr. Mark Drybrough and his conduct which occurred on July 1 to July 27; and Count 2 with the assisting, encouraging, and advising Nadia Kajouji for his conduct on March 6 through March 10 of 2008."

11. To be clear, I am not suggesting that the complaint in this case violated the "nature and cause" requirement of the Due Process Clause discussed in *State v. Kendell*, 723 N.W.2d 597, 611 (Minn.2006), or that the State's failure to include the word "assist" in the to-wit section of the complaint would have supported a pretrial motion to dismiss under Minn. R.Crim. P. 17.06, subd. 1. Instead, I am simply noting that the record before us case plainly demonstrates that from the very beginning of this prosecution, the State's case has focused on whether Melchert–Dinkel "advised" or "encouraged" the victims to commit suicide, and not whether he "assisted" their suicides.

**28**

district court deliberately omitted the word "assist" from its factual findings, and therefore a remand to decide whether Melchert–Dinkel's actions constitute "assist[ing]" Drybrough and Kajouji in taking their own lives will waste judicial resources.

### IV.

For the reasons discussed above, I would not remand to the district court for further proceedings, and because the words "advis[ing]" and "encourage[ing]" as used in Minn.Stat. § 609.215, subd. 1, must be severed from the statute as unconstitutional, I would reverse Melchert–Dinkel's convictions.