*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0073**

State of Minnesota,
Respondent,

vs.

William Francis Melchert-Dinkel,
Appellant.

**Filed December 28, 2015
Affirmed in part and reversed in part
Smith, Judge
Dissenting, Kirk, Judge**

Rice County District Court
File No. 66-CR-10-1193

Lori Swanson, Attorney General, St. Paul, Minnesota; and

John L. Fossum, Rice County Attorney, Terence Swihart, Assistant County Attorney, Faribault, Minnesota (for respondent)

Terry A. Watkins, Watkins Law Office, LLC, Faribault, Minnesota (for appellant)

Considered and decided by Kirk, Presiding Judge; Worke, Judge; and Smith, Judge.

**U N P U B L I S H E D   O P I N I O N**

**SMITH**, Judge

We affirm appellant's conviction of assisting suicide because the complaint did not violate appellant's Sixth Amendment rights, the proceeding on remand did not violate the Double Jeopardy Clause, the district court did not abuse its discretion by denying

appellant's motion to withdraw his jury-trial waiver, and the evidence is sufficient to support the district court's finding of appellant's guilt. But we reverse appellant's conviction of attempting to assist suicide because the evidence is not sufficient to support a finding of guilt on that charge.

**FACTS**

In April 2010, the state charged appellant William Francis Melchert-Dinkel with two counts of aiding suicide in violation of Minn. Stat. § 609.215, subd. 1 (2004). At the time, the statute prohibited "intentionally advis[ing], encourag[ing], or assist[ing] another in taking the other's own life." Minn. Stat. § 609.215, subd. 1. The state alleged that Melchert-Dinkel advised, encouraged, or assisted the suicides of Mark Drybrough of Coventry, England and Nadia Kajouji of Ottawa, Canada via "internet correspondence." After Melchert-Dinkel submitted the case to the district court for a stipulated-facts trial under Minn. R. Crim. P. 26.01, subd. 3, the district court found him guilty on both counts. The district court concluded that Melchert-Dinkel "intentionally advised and encouraged" both Drybrough and Kajouji to commit suicide.

Melchert-Dinkel appealed, challenging the statute's constitutionality, and this court affirmed his convictions. *State v. Melchert-Dinkel*, 816 N.W.2d 703, 705 (Minn. App. 2012). But the supreme court reversed. *State v. Melchert-Dinkel*, 844 N.W.2d 13, 25 (Minn. 2014). The supreme court held that the statute's prohibitions on "advis[ing]" and "encourag[ing]" suicide were unconstitutional and struck "advise" and "encourage" from the statute. *Id.* at 24. The supreme court rejected Melchert-Dinkel's argument that the statute's prohibition on "assist[ing]" suicide was also unconstitutional. *Id.* at 23.

2

Because the district court had found only that Melchert-Dinkel "intentionally advised and encouraged" the suicides and, "understandably, made no findings" regarding whether he had assisted them, the supreme court remanded for further proceedings. *Id.* at 25.

On remand, Melchert-Dinkel moved the district court to withdraw his waiver of a jury trial and agreement to a stipulated-facts trial. He also moved for a dismissal of the case based on double jeopardy and lack of probable cause. The district court denied these motions. The district court then found Melchert-Dinkel guilty of assisting Drybrough's suicide and of the lesser-included offense of attempting to assist Kajouji's suicide.

## D E C I S I O N

### I.

Melchert-Dinkel challenges the proceedings on remand, arguing that (1) the complaint violated his Sixth Amendment rights by not providing notice that he was charged with assisting the suicides; (2) the supreme court's remand violated the Double Jeopardy Clause; and (3) the district court erred by denying his motion to withdraw his jury-trial waiver.

### A.    Notice of the Assisting Charges

We review Melchert-Dinkel's constitutional argument de novo. *See State v. Kendell*, 723 N.W.2d 597, 611 (Minn. 2006). The federal and state constitutions require defendants to be "informed of the nature and cause of the accusation." U.S. Const. amend. VI; Minn. Const. art. 1, § 6. This requirement "is satisfied if an indictment contains such descriptions of the offense charged as will enable a defendant to make his defense and to plead the judgment in bar of any further prosecution for the same crime."

3

*Kendell*, 723 N.W.2d at 611 (quotation omitted). Although a complaint "is sufficient if the language used spells out all essential elements in a manner which has substantially the same meaning as the statutory definition," "it is unnecessary to identify each specific element of the crime." *State v. Dunson*, 770 N.W.2d 546, 551 (Minn. App. 2009), *review denied* (Minn. Oct. 20, 2009). "[A] charging document imperfect in form is not fatally defective if it adequately apprises the defendant of the charge against him." *Id.* at 552.

Here, count 1 alleged: "On or about July 27, 2005, within the County of Rice, defendant William Francis Melchert-Dinkel did advise, encourage, or assist another in taking the other's own life, to wit: did advise and encourage Mark Drybrough, of Coventry, UK, using internet correspondence, and Mark Drybrough did take his own life." Count 2 alleged: "On or about March 9-10, 2008, within the County of Rice, defendant William Francis Melchert-Dinkel did advise and encourage another in taking the other's own life, to-wit: did advise and encourage Nadia Kajouji of Ottawa, Ontario, Canada using internet correspondence and Nadia Kajouji did take her own life."

Melchert-Dinkel is correct that the complaint emphasized advising and encouraging, rather than assisting. Count 2 does not include assisting at all. But other evidence in the record refutes Melchert-Dinkel's contention that he had no notice of the assisting charge. The statement of probable cause in the complaint used advising, encouraging, and assisting when discussing Melchert-Dinkel's actions. Melchert-Dinkel admitted to police that he "most likely" assisted someone's suicide. And in their original arguments to the district court, both parties used all three terms from the statute. As the supreme court explained, "both parties proceeded at trial [and through the first appeal] as

4

if 'assisted' was part of the complaint for both victims." *Melchert-Dinkel*, 844 N.W.2d at 25 n.6. The record therefore suggests that Melchert-Dinkel was "adequately apprise[d]" of the charges against him. *See Dunson*, 770 N.W.2d at 552.

In addition, the supreme court has already rejected Melchert-Dinkel's argument that he lacked notice of the assisting charges and rejected the dissent's contention that "this was an advise-or-encourage case." *Melchert-Dinkel*, 844 N.W.2d at 24-25 n.6, 27. Moreover, even the dissent rejected any inference that the complaint "violated the 'nature and cause' requirement of the Due Process Clause." *Id.* at 27 n.11 (Page, J., dissenting). The complaint therefore did not violate Melchert-Dinkel's Sixth Amendment rights.

**B.    Double Jeopardy**

The Double Jeopardy Clauses of the state and federal constitutions "protect a criminal defendant from three distinct abuses:  a second prosecution for the same offense after acquittal; a second prosecution for the same offense after conviction; and multiple punishments for the same offense." *State v. Humes*, 581 N.W.2d 317, 320 (Minn. 1998). We review a claim of double jeopardy de novo. *State v. Leroy*, 604 N.W.2d 75, 77 (Minn. 1999).

Melchert-Dinkel admits that he was not previously convicted of assisting the suicides and makes no argument that he received multiple punishments for the same offense.   Therefore, he only argues that the remand proceeding was "a second prosecution for the same offense after acquittal." *See Humes*, 581 N.W.2d at 320. Although the district court did not explicitly acquit Melchert-Dinkel of assisting the

5

suicides, Melchert-Dinkel argues that the district court's failure to address assistance "should be deemed an acquittal."

"A [district] court's actions amount to an acquittal on the merits when the ruling of the judge, whatever its label, actually represents a resolution in defendant's favor, correct or not, of some or all of the factual elements of the offenses charged." *State v. Large*, 607 N.W.2d 774, 779 (Minn. 2000) (quotation omitted). The supreme court already determined that the state prosecuted Melchert-Dinkel for advising, encouraging, and assisting the suicides in the original trial. *Melchert-Dinkel*, 844 N.W.2d at 24-25 n.6. In addition, it concluded that the district court "understandably[] made no findings" regarding assisting because it used the statute's terms broadly and "inconsistently," and rejected the dissent's characterization of the district court's omission as "deliberate." *Id.* at 25 & n.7. Because the district court simply made no findings regarding whether Melchert-Dinkel assisted the suicides, it did not determine the merits of the assisting-suicide charges and did not acquit Melchert-Dinkel of the charges. *See Large*, 607 N.W.2d at 779.

In *State v. Schmidt*, the state filed an amended complaint under a different statute after the original statute was declared unconstitutional. 612 N.W.2d 871, 873-74 (Minn. 2000). The supreme court rejected the appellant's double-jeopardy argument because, "where a conviction is overturned on appeal due to the unconstitutionality of the charging statute, prosecuting the defendant under a different statute is not the sort of governmental oppression against which double jeopardy was intended to protect criminal defendants."

6

*Id.* at 876. The appellant could not "avoid prosecution simply because the statute under which he was originally charged and tried was declared unconstitutional." *Id.*

Here, the state did not need to file an amended complaint because only two of the three alternative means for violating Minn. Stat. § 609.215, subd. 1, were declared unconstitutional and all three means were included in the original complaint. *See Melchert-Dinkel*, 844 N.W.2d at 24-25 & n.6. But, as in *Schmidt*, prosecuting Melchert-Dinkel on remand under the remaining portion of the statute "is not the sort of governmental oppression against which double jeopardy was intended to protect criminal defendants." *See Schmidt*, 612 N.W.2d at 876. Because Melchert-Dinkel was not previously acquitted of assisting the suicides, the proceeding on remand did not violate double jeopardy.

## C.    Withdrawal of Jury-Trial Waiver

Before his original trial, Melchert-Dinkel waived his jury-trial rights both in writing and on the record in court. *See* Minn. R. Crim. P. 26.01, subd. 1(2)(a) (stating that a defendant "may waive a jury trial on the issue of guilt provided the defendant does so personally, in writing or on the record in open court"). On remand, Melchert-Dinkel moved the district court to withdraw his waiver of a jury trial and agreement to a stipulated-facts trial. The district court denied this motion.

Our research reveals no caselaw addressing whether a defendant is entitled to withdraw a jury-trial waiver on remand. We therefore analyze the specific scope of the supreme court's remand instructions in this case. A district court must strictly execute the terms of a remand instruction. *Duffey v. Duffey*, 432 N.W.2d 473, 476 (Minn. App.

7

1988).  But when the remand instruction is not specific, the district court has discretion "to proceed in any manner not inconsistent with the remand order."  *Id.*  We review the district court's compliance with remand instructions for an abuse of discretion.  *Janssen v. Best & Flanagan, LLP*, 704 N.W.2d 759, 763 (Minn. 2005).

The supreme court's remand instructions state:  "Because Melchert-Dinkel was found guilty, and convicted, under the portions of the statute that we have now excised as unconstitutional, but not under the remaining constitutional portion of the statute, we reverse Melchert-Dinkel's conviction and remand to the district court for proceedings consistent with this opinion."  *Melchert-Dinkel*, 844 N.W.2d at 25.  The district court interpreted this language as directing it to make findings regarding whether Melchert-Dinkel assisted the suicides and as not ordering a new trial or implying that Melchert-Dinkel could withdraw his jury-trial waiver.  Melchert-Dinkel disagrees with this interpretation, arguing before the district court that he is entitled to "start fresh with the [amended] statute," but cites no caselaw that would suggest that the district court abused its discretion.

In *Duffey*, this court's remand "for a determination of an appropriate amount of permanent spousal maintenance" was not specific regarding "how the [district] court was to proceed in determining permanent maintenance."  432 N.W.2d at 476.  On remand, the district court chose not to reopen the record.  *Id.* at 475.  In the second appeal, this court held that the district court did not abuse its discretion in interpreting the remand order and "denying appellant's discovery request prior to making its determination regarding permanent spousal support."  *Id.* at 476.  As in *Duffey*, the supreme court's remand

instruction did not mandate a specific method for the district court to follow in determining whether Melchert-Dinkel assisted the suicides. *See id.* The supreme court did not require the district court to start over and conduct a new trial. And no other caselaw requires a district court to conduct a new trial or permit the withdrawal of a jury-trial waiver on remand, especially when, as here, the evidence was agreed upon by the parties. Therefore, we conclude that the district court's decision to make additional findings based on the existing stipulated evidence was reasonable.

The dissent cites *State v. Little*, 851 N.W.2d 878, 883 (Minn. 2014) for the proposition that Melchert-Dinkel was entitled to withdraw his jury-trial waiver on remand and receive a new trial. But *Little* is distinguishable because it holds that a defendant must provide a new jury-trial waiver when a complaint is amended on remand; it does not require a new waiver in the absence of an amended complaint. 851 N.W.2d at 883. Because Melchert-Dinkel had notice of the assisting charge, his complaint was not amended on remand and *Little* is not on point.

Because the district court's determination that it was not required to hold a new trial on remand was reasonable, its denial of Melchert-Dinkel's motion to withdraw his jury-trial waiver was also reasonable. A defendant "may withdraw the waiver of a jury trial any time before trial begins." Minn. R. Crim. P. 26.01, subd. 1(3). Because the district court determined that it had already held Melchert-Dinkel's trial and was merely making additional findings on remand regarding Melchert-Dinkel's assistance of the suicides, Melchert-Dinkel was not entitled to withdraw his waiver. *See id.* The district

court did not abuse its discretion in interpreting the supreme court's remand instructions and denying Melchert-Dinkel's motion to withdraw his jury-trial waiver.

## II.

Melchert-Dinkel also challenges the sufficiency of the evidence for his convictions.[1] When assessing the sufficiency of the evidence, we analyze the record "to determine whether the evidence, when viewed in a light most favorable to the conviction," was sufficient to allow the fact-finder to reach its verdict. *State v. Caine*, 746 N.W.2d 339, 356 (Minn. 2008) (quotation omitted). We will not reverse a guilty verdict if the fact-finder, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably conclude that the defendant was guilty of the charged offense. *State v. Vang*, 847 N.W.2d 248, 258 (Minn. 2014).

### A.    Assisting the Suicide of Mark Drybrough

On July 1, 2005, Melchert-Dinkel, using the name Li Dao, responded to Drybrough's post on a suicide website asking for "details of hanging methods where there isn't access to anything high up to tie the rope to." Li Dao stated:

> [D]epending on how tall you are, preferrable under 6 feet
> tal[l], you can easily hang from a door using the knob on
> on[e] side to tie the rope to, sling it over the top of the door,

---

[1] In an issue statement in his principal brief, Melchert-Dinkel appears to challenge both the constitutionality of the amended statute as applied to him and the sufficiency of the evidence for this charge. But Melchert-Dinkel clarified in his reply brief that he does not challenge the constitutionality of the amended statute. We note that the supreme court has already determined that the amended statute's prohibition against "assist[ing] another in taking the other's own life" is constitutional on its face, *Melchert-Dinkel*, 844 N.W.2d at 23, and that Melchert-Dinkel provides no analysis regarding an as-applied constitutional challenge.

attach the noose or loop to yourself then step off and hang succes[s]fully.  If you are a bit tall you can still do a partial suspension hanging that way by having the noose etc fairly high up and attaching it to yourself, then lowering yourself into a sitting position or kneeling down so you hang that way.  It is very effective[.]  I have trialed it 5 times now with very good results so I am using it for certain when I go.  [U]nconsciousness occur[e]d in about 10-15 se[co]nds if it doe[s] not occur then you need more neck ten[s]ion and try again.  Unconsciousness is [in] 10-15 se[co]nds or so, brain death in 4 minutes after unconsciousness and death in 10 minutes.[]  [H]ope this help[]s. . . . good luck.

On July 18, Drybrough inquired about overdose medications on the suicide website.  Li Dao responded:

As a veteran nurse I have found that, as a rule, overdosing is at best very unpredictable and unsure because of so many many factors.  If you are very serious about dying, I too agree that suspen[s]ion hanging is by far the best and surest method to do, and it is the method I am using also. . . . good luck.

Drybrough later told Li Dao that he had practiced with the noose but was thinking that it might be easier to take pills instead.

In another message, Li Dao told Drybrough that she had recently watched a friend commit suicide over a webcam, stating that "it was very pe[ace]ful[]" and that she "was pretty pleased [she] could make this guy[']s last moments special for him."  Li Dao asked Drybrough if there was a timeline for his suicide because she wanted to commit suicide as well but planned to "stay here for you as long as possible."  Drybrough responded that he had not yet set a date.

On July 22, Li Dao messaged Drybrough:  "I hope [it] is not too late, that you are still here.  Please write and let me know.  I am here to care and help you."  Drybrough responded the next day:

11

> I'm still here, I've had a few days where I've been feeling very ill, physically and mentally. I'm not very good at thinking of things to say. It was good of you to write back, thank[]you. I get scared when I'm about to do it, I don't want to lie to you. I keep holding on to the hope that things might change. Caught between being suicidal and considering it. Same old story! I'm dying but slowly, day by day. I don't want to waste anyones time. If you want someone who's suicidal, I'm just not there yet. You either do it or you don't, and I don't and hav[e]n't. I used to being alone. Sorry. I admire your courage, I wish I had it.

Drybrough committed suicide on July 27. He "was found hanging at home with a rope attached to a loft ladder."

A conviction under Minn. Stat. § 609.215, subd. 1, requires intent. *See* Minn. Stat. § 609.215, subd. 1 (criminalizing "intentionally" assisting another's suicide). The defendant must have "a purpose to do the thing or cause the result specified or believe[] that the act performed by the actor, if successful, will cause that result." Minn. Stat. § 609.02, subd. 9(3) (2014). Intent may be inferred from the defendant's conduct and the surrounding circumstances. *State v. Whisonant*, 331 N.W.2d 766, 768 (Minn. 1983). Melchert-Dinkel argues that his intent was only "to get Mr. Drybrough to let him watch his suicide on webcam." But while he once mentioned watching someone else commit suicide via webcam, Melchert-Dinkel never asked to watch Drybrough's suicide. Melchert-Dinkel instead provided Drybrough with hanging instructions and repeatedly urged hanging as the "best and surest method." Melchert-Dinkel's communications suggest an intent to assist Drybrough to commit suicide rather than an intent to watch that suicide by webcam. The evidence therefore supports the district court's determination that Melchert-Dinkel intended to assist Drybrough's suicide.

12

In Melchert-Dinkel's previous appeal, the supreme court defined "assist" as "'help,' which in turn is defined as to 'provide (a person etc.) with what is needed for a purpose.'" *Melchert-Dinkel*, 844 N.W.2d at 23 (quoting *The New Shorter Oxford English Dictionary* 132, 1216 (1993)). The supreme court then explained that the statute's prohibition on "assist[ing]" suicide

> proscribes speech or conduct that provides another person with what is needed for the person to commit suicide. This signifies a level of involvement in the suicide beyond merely expressing a moral viewpoint or providing general comfort or support. Rather, "assist," by its plain meaning, involves enabling the person to commit suicide. While enablement perhaps most obviously occurs in the context of physical assistance, speech alone may also enable a person to commit suicide.

*Id.* On remand, the district court determined that Melchert-Dinkel enabled Drybrough to commit suicide and therefore assisted him in violation of Minn. Stat. § 609.215, subd. 1.

Citing *Brandenburg v. Ohio*, 395 U.S. 444, 89 S. Ct. 1827 (1969), Melchert-Dinkel argues that a conviction under Minn. Stat. § 609.215, subd. 1, requires "imminence" between his words and Drybrough's actions. But *Brandenburg* deals with the incitement exception to the First Amendment, and the supreme court has already determined that the incitement exception does not apply here. *Melchert-Dinkel*, 844 N.W.2d at 19-21. Because suicide is not a criminal offense in Minnesota, Melchert-Dinkel's discussion of caselaw that analyzes speech inciting unlawful action is not on point. *See id.* at 19-20.

Instead of "imminence," the statute requires a "direct, causal link[] between speech and the suicide." *Id.* at 23. The district court determined that there was a "direct,

causal relationship" because Melchert-Dinkel communicated directly with Drybrough and Drybrough followed Melchert-Dinkel's instructions. But Melchert-Dinkel raises several reasons why he believes there is no causal relationship between his statements and Drybrough's suicide, including: (1) Drybrough had already decided to commit suicide by hanging before communicating with Melchert-Dinkel; (2) Drybrough also received hanging instructions from another individual; (3) Drybrough's suicide occurred four days after his last communication with Melchert-Dinkel; and (4) there is no evidence Drybrough followed Melchert-Dinkel's instructions.

The record does not support Melchert-Dinkel's assertion that Drybrough had already decided to commit suicide by hanging before communicating with Melchert-Dinkel. It is true that Melchert-Dinkel's original communication responded to Drybrough's request for information about "hanging methods." But Drybrough later requested information about overdose medications and told Melchert-Dinkel that, after practicing with a noose, he wondered if overdosing would be "easier." Drybrough's comments reveal someone who was considering more than one suicide method, not someone who was fully committed to suicide by hanging before communicating with Melchert-Dinkel.

Melchert-Dinkel is correct that Drybrough also received hanging instructions from another individual. But Melchert-Dinkel cites no caselaw to support his proposition that the other person's instructions broke the "direct, causal link[]" between his communications and Drybrough's suicide. *See id.* at 23. As the district court explained,

14

causation does not require Melchert-Dinkel's assistance "to be the sole cause of the suicide."

Melchert-Dinkel also argues that "[t]here was no causal connection between" his e-mails and Drybrough's suicide because the suicide occurred five days after he last e-mailed Drybrough and four days after Drybrough last e-mailed him. Melchert-Dinkel is correct about the timing of Drybrough's suicide, but again, the supreme court did not require imminence or immediacy between the communications and the suicide, only a "direct, causal link[]." *Id.* The timing of Drybrough's suicide, four days after he last communicated with Melchert-Dinkel and less than one month after the first communication, supports the district court's finding of a "direct, causal relationship."

Finally, when viewed in the light most favorable to the conviction, the evidence supports the district court's conclusion that Drybrough followed Melchert-Dinkel's instructions. Melchert-Dinkel instructed Drybrough to tie a rope to a doorknob, "sling it over" the door, "attach the noose" to himself, and "step off and hang success[s]fully." He also described lowering into a sitting or kneeling position if Drybrough was too tall. Drybrough was found hanging "with a rope attached to a loft ladder." Although Melchert-Dinkel instructed Drybrough to hang from a door rather than a ladder, his other instructions appear to apply to Drybrough's ladder arrangement. No evidence clearly refutes the district court's conclusion that Drybrough followed Melchert-Dinkel's instructions.

When viewed in the light most favorable to the conviction, the stipulated facts are sufficient to support the district court's verdict. In response to Drybrough's request for

information about "hanging methods," Melchert-Dinkel provided a list of detailed steps. When Drybrough suggested that he might take pills instead, Melchert-Dinkel urged hanging as the "best and surest method." In other messages, Melchert-Dinkel described hanging as "very pe[a]ceful[]" and quick, with the body "relax[ing] naturally" after reaching unconsciousness. Drybrough told someone else that he appreciated Melchert-Dinkel's hanging instructions because he was "not at all practical" and was hoping to receive step-by-step instructions or "information [he] hadn't come across before." Melchert-Dinkel also stated more than once that he hoped he was helping Drybrough. Drybrough hung himself four days after his last message to Melchert-Dinkel and less than one month after the first communication with him. Finally, Melchert-Dinkel admitted to police that he "most likely" assisted someone's suicide and that he believed he was an "accessory" to suicide.

The supreme court has already "note[d] that speech instructing another on suicide methods falls within the ambit of constitutional limitations on speech that assists another in committing suicide." *Id.* Melchert-Dinkel's above actions provided Drybrough with what was needed for him to commit suicide. *See id.* Therefore, the district court could reasonably conclude that Melchert-Dinkel was guilty of assisting Drybrough's suicide, and the evidence was sufficient to support his conviction. *See Vang*, 847 N.W.2d at 258.

**B.     Attempting to Assist the Suicide of Nadia Kajouji**

On March 1, 2008, Kajouji posted on a suicide website, asking for a suicide method with "the highest chance of success" that would "[i]deally . . . look like an accident" because she was "terrified of failing." On March 6, Melchert-Dinkel responded

16

to this post as "Cami," telling Kajouji that "she" was also suicidal and had chosen to hang

herself based on her knowledge as a nurse. She then asked Kajouji about her plans:

> Cami: you want to use hanging too?
> Cami: or can u?
> Nadia: I'm going to jump
> Cami: well
> Cami: that is ok but most people puss out before doing that plus they dont wanna leave a terribly messy mess for others to clean up
> Nadia: I want it to look like an accident. There's a bridge over the river where there's a break in the ice. The water is really rough right now and it should carry me back under the ice so I can't come up for air. And if drowning doesn't get me, hopefully the hypothermia will.

But Cami continued to recommend hanging because it "is so fast and certain," and

suggested that she could help Nadia position the rope if she had a webcam. She

continued:

> Cami: i[] hope im being a help to you
> Cami: in some way
> Nadia: yes it's a big relief to be able to talk to someone about it
> . . . .
> Cami: im not tryin to tell you how to do it just my experiences and opinions that all
> Nadia: i understand. we want what's best for each other
> Cami: yes very much so
> Cami: and i dont want you to fail ever!
> Cami: and end up messed up
> Nadia: that would be the worst
> Cami: omg yes i see that happena lot : (
> . . . .
> Cami: ive seen tons of failed overdoses and bad wrist cuttings and some j[u]mpers fail and many many gunshots that didnt work
> . . . .
> Cami: in 7 years ive never seen a failed hanging that is why i chose that

17

Cami later asked Nadia if she had "something to use for hanging" if she decided to do that with her and stated that it was not hard to get the equipment. Cami also stated that she "want[ed] to be found and in decent shape" for a viewing and that drowned bodies look "terrible." When Nadia asked what would happen because her parents did not live in the city, Cami responded that it would take time to find and identify her body:

> Cami: so most lik[e]ly no viewing or anything due to time and trauma
> Cami: if you are carried away in the river current they may never find you or maybe a long time later way down stream
> Cami: the further waay the harder to identify
> Cami: you would be a missing person until fou[]nd
> . . . .
> Cami: that is why im keeping everything here at my home
> Cami: easy for my mom
> Nadia: Yeah. Well I'm sure they'll find me because I'm not jumping in the actual river, I'm jumping in the canal, it won't take me too far. I guess I should have my wallet in a zippered pocket so I have some ID on me.

During a second conversation that evening, Cami stated that she had practiced hanging herself and that "it felt like going to sleep for a[n] operation." Cami also emphasized their suicide pact:

> Cami: i wish [we both] could die now while we are quietly in our homes tonite:)
> Cami: nice thought
> Nadia: it is a nice thought
> Nadia: since i decided that i will go this weekend, i have felt much better
> Cami: great
> Cami: im at peace too
> Cami: and if i cant die with you i will shortly after that
> Nadia: we are together in this
> Cami: yes i promise
> Cami: monday will be my day

They ended their conversation:

18

> Nadia:  i wonder how it will feel to actually die
> Cami:  nice
> Nadia:  yes

On March 9, Nadia told Cami:  "I'm glad that things are going to end tonight. . . . I've got all my affairs in order.  I'm feeling confident[.]"  But Cami again asked about hanging:

> Cami:  did you get rope in case you need back [up] plan
> . . . .
> Nadia:  no I didn't.  there is a store close by if I need to

Later that night, Kajouji e-mailed a roommate to say she was going skating.  Her body, still wearing ice skates, was recovered from the river six weeks later.  The cause of death was drowning or hypothermia.

On remand, the district court acquitted Melchert-Dinkel of assisting Kajouji's suicide because Kajouji did not use Melchert-Dinkel's suicide method and convicted him of the lesser-included offense of attempting to assist her suicide.  A defendant may be convicted of the crime charged in the complaint or any lesser-included offense, including attempt to commit the crime charged, but not both.  Minn. Stat. § 609.04 (2014).  A district court may consider a lesser-included offense on its own motion.  *See State v. Dahlin*, 695 N.W.2d 588, 598 (Minn. 2005) (stating that a district court may provide a lesser-included-offense instruction to the jury in its discretion even if the defendant has waived that instruction).

"Whoever, with intent to commit a crime, does an act which is a substantial step toward, and more than preparation for, the commission of the crime is guilty of an attempt to commit that crime . . . ."  Minn. Stat. § 609.17, subd. 1 (2014).  The record

19

supports the district court's conclusion that Melchert-Dinkel "intended to assist" Kajouji's suicide because he answered all of Kajouji's logistical questions, mentioned helping her multiple times, offered to watch Kajouji hang herself via webcam, and entered a suicide pact with her. *See* Minn. Stat. § 609.02, subd. 9(4) (2014) (stating that "with intent to" means that the actor "has a purpose to do the thing or cause the result specified").

But the evidence does not support the district court's conclusion that Melchert-Dinkel "did more than merely prepare to give assistance" to Kajouji through "detailed and specific" instructions for committing suicide by hanging. Unlike his detailed messages to Drybrough, Melchert-Dinkel did not provide detailed hanging instructions to Kajouji. Melchert-Dinkel told Kajouji that "IF it comes down to hanging," he could help her position the rope over webcam. He also explained that hanging was "fast and certain" and that he had "never seen a failed hanging." Melchert-Dinkel's only detailed instructions involved the type of rope Kajouji would need:

> if you go to a home depot or menards or any kind of home improvement store[,] get yellow nylon rope about 8 feet or about 3.5 meters and about 1/2 in[]ch thick or about 3 cm[.] that is all you need and look arou[nd] your apartment for somewhere to hang from .[] i can help you with the cam when you need to

Given the lack of specific instructions regarding hanging, the record does not support the district court's finding that Melchert-Dinkel made a substantial step of assistance.

The state argues that Melchert-Dinkel attempted to provide Kajouji with what she needed: "a confidant, a suicide partner, strength, knowledge, assistance, and eventually death." But assisting suicide under the statute requires more than "providing general

20

comfort or support" and more than merely providing information, "courage, confidence, or hope." *Melchert-Dinkel*, 844 N.W.2d at 23 (defining "assist," "advise," and "encourage") (quotation omitted). Melchert-Dinkel merely encouraged Kajouji to commit suicide by hanging, advised her about aspects of her plan, and "provid[ed] general comfort or support" for her decision to commit suicide. *See id.* Because encouraging, advising, and supporting cannot justify a conviction under the amended statute, *see id.* at 23-24, any step Melchert-Dinkel made in encouraging, advising, and supporting Kajouji also cannot justify a conviction for *attempting* to violate the statute. There is therefore no evidence of any substantial step of assistance.[2] Given the lack of specific instructions and the overall tone of comfort and support in Melchert-Dinkel's communications, we conclude that the evidence is insufficient to support Melchert-Dinkel's conviction for attempting to assist Kajouji's suicide.

**Affirmed in part and reversed in part.**

---

[2] The evidence does not support the state's assertion that Kajouji moved her jump from a river to a canal after communicating with Melchert-Dinkel. Kajouji used both terms in her communications, and the record does not reveal whether there was more than one bridge in her area. The only thing Kajouji may have changed after communicating with Melchert-Dinkel was to put her ID in a zippered pocket.

21

**KIRK**, Judge (concurring in part, dissenting in part)

I join in the court's opinion, except with respect to whether appellant had a right to a jury trial on remand. When the Minnesota Supreme Court reversed appellant's conviction and remanded for further proceedings, he was entitled to a new trial, not a reconsideration of his stipulated-facts trial. *See State v. Melchert-Dinkel*, 844 N.W.2d 13, 24-25 (Minn. 2014); Minn. R. Crim. P. 28.02, subd. 12, Minn. R. Crim. P. 29.04, subd. 11(7) (requiring an appellate court that reverses a judgment to "(a) direct a new trial; (b) vacate the conviction and enter a judgment of acquittal; or (c) reduce the conviction to a lesser included offense or to an offense of lesser degree . . . ."). Accordingly, the district court should have granted appellant's motion to withdraw his jury-trial waiver and his agreement to a stipulated-facts trial.

The right to a jury trial on remand is particularly important in this case. At his omnibus hearing, appellant challenged the constitutionality of Minn. Stat. § 609.215, under which he was charged. When the district court denied his motion, he moved the court to certify the question concerning the constitutionality of the statute for pretrial appeal, claiming the issue was important or doubtful under Minn. R. Crim. P. 28.03. When it denied this request, appellant waived his right to a jury trial and agreed to a stipulated-facts trial in order to preserve his right to appeal the issue.

Ultimately, appellant prevailed on his constitutional challenge with respect to "advising" and "encouraging" another in committing suicide. *Melchert-Dinkel*, 844 N.W.2d at 24-25. These were the means of committing the crime that the state included

in the complaint's charging language and that the district court cited in finding appellant guilty.

The playing field has changed significantly since appellant waived his right to a jury trial. Proving that a person advised or encouraged another in taking the other's own life requires much less than proving that the person actually assisted in a suicide. Appellant may have waived his right to a jury trial only because these more easily proven means were in play and, from the charging language in the complaint, they seemed to be the provisions of the statute upon which the state was relying. With the supreme court having since declared the less-demanding language to be unconstitutional, due process requires that appellant be granted an opportunity for a jury to decide his fate on the gutted statute. *See Brady v. United States*, 397 U.S. 742, 748, 90 S. Ct. 1463, 1469 (1970) ("Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences."); *State v. Little*, 851 N.W.2d 878, 883 (Minn. 2014) (holding that, when the state amends the complaint by adding a new charge after a defendant's jury-trial waiver, the district court must obtain a renewed jury-trial waiver from the defendant on the added charge, explaining in part, that "defendants consider the merits of their case and trial strategy" in waiving a jury trial).

If appellant originally had a jury trial, he clearly would have had the right to a jury trial on remand. By reversing and remanding for "proceedings consistent with this opinion," the supreme court did not suggest that a new trial was simply a reconsideration of the evidence in the previous stipulated-facts trial. *Melchert-Dinkel*, 844 N.W.2d at 25.

D-2

The majority's decision will discourage defendants in cases like this from using the more efficient route of a stipulated-facts trial to preserve their appellate rights on a pretrial ruling. To fully protect all possible interests on remand, they will need to exercise their right to a jury trial.